Clarence RAMEY et al., Plaintiffs,

v.

Paul T. HARBER, Defendant.

Civ. A. No. 76–0846.

United States District Court,
W. D. Virginia,
Abingdon Division.

April 22, 1977.

much as all post-trial arguments have been heard and all post-trial briefs filed, the court now proceeds to consider defendant's contentions and to make appropriate findings of fact and conclusions of law.

## STATEMENT OF THE FACTS NOT AT ISSUE

Up until December 31, 1975, plaintiffs in this action held positions as deputy sheriffs in Lee County, Virginia. All of the plaintiffs were appointed as deputy sheriffs by Curtis H. Flanary who was Sheriff of Lee County from January 1, 1972 through December 31, 1975. Mr. Flanary was elected Sheriff in the general election held in November of 1971. Apparently, upon assuming office, Mr. Flanary hired a totally new set of deputies, retaining none of the deputies who served under his predecessor, a Democrat. Mr. Flanary stood for re-election to the Office of Sheriff in the general election held in November of 1975. He was opposed by the defendant, Paul T. Harber, who ran as the candidate of the Democratic Party. Mr. Harber proved to be the successful candidate and, accordingly, commenced preparations for the assumption of office at 12:01 a. m. on January 1, 1976.

Apparently, Sheriff-elect Harber proceeded to issue formal application forms to all individuals who indicated an interest in the position of deputy sheriff. It is uncontroverted that only one of the named plaintiffs made a formal application for employment as a deputy under Sheriff Harber.[1] Out of the more than fifty applicants, Sheriff Harber selected ten candidates to serve as deputies. None of the plaintiffs were numbered among the successful applicants. However, the record reveals that during the period between the election and the time of Sheriff Harber's assumption of office, most of the plaintiffs expressed an active interest in the status of their jobs.[2] Indeed,

Walton D. Morris, Jr., Bradshaw & Morris, Ltd., Big Stone Gap, Va., for plaintiffs.

Edgar Bacon, Richard Larry Lewis, Commonwealth Atty., Jonesville, Va., for defendant.

## MEMORANDUM OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TURK, Chief Judge.

This action is predicated on 42 U.S.C. § 1983 *et seq.* and came to be tried by this court. Perceiving this case to involve certain factual issues of great import, the court empaneled an advisory jury to assist the court in the consideration of such questions, pursuant to Rule 39(c) of the Federal Rules of Civil Procedure. Following trial of this case, conducted from January 26, 1977 through January 28, 1977, the advisory jury responded to special verdict form questions with answers totally favorable to plaintiffs. By way of a motion for judgment notwithstanding the verdict, defendant would now have the court reject the advisory jury's findings. Throughout the development of this case, defendant has contended that the resolution of the issues turns solely on an interpretation of Virginia law. Defendant further contends that even if the jury's findings are adopted, judgment against the defendant cannot be effected since the case involves application of newly developed constitutional law which should properly be applied prospectively. Inas-

1. As discussed *infra*, the appointments of Sheriff Flanary's deputies ended with the term of their principal.

2. In this context, it is perhaps relevant to note that the plaintiffs apparently felt that they had

expressed their interest in continued employment to Sheriff-elect Harber in the period between the election and the end of the year. At trial, it became evident that most of the plaintiffs felt that making formal application for deputy sheriff would have been either futile or

such interest apparently resulted in the development of a degree of friction between some of the deputies and Sheriff-elect Harber. On the night of December 31, 1975, Sheriff-elect Harber and his staff of deputies went to the Lee County Sheriff's Office so as to prepare to commence execution of the duties of Sheriff at 12:01 a. m. on January 1, 1976. Sheriff-elect Harber and his staff were confronted by many of Sheriff Flanary's deputies who again requested information on their status. As in previous discussions, Sheriff-elect Harber told the Flanary deputies, in essence, that their status was solely the concern of their principal, Sheriff Flanary, and that their continued employment was not a matter for his (Harber's) comment. Sheriff-elect Harber and his deputies began execution of the duties of the office of Sheriff on January 1, 1976.

It is uncontroverted that all of the plaintiffs campaigned actively in Sheriff Curtis Flanary's bid for re-election. At the time of trial, it became apparent that the motivation for such political activity varied from plaintiff to plaintiff. Several of the plaintiffs attributed their political work to a long-standing affiliation with the Lee County Republican Party. Other plaintiffs noted that they were interested in maintaining Sheriff Flanary in office so that they might be assured of keeping their own jobs. Indeed, Sheriff Flanary testified that he expected all his deputies to work for him in the campaign. Sheriff Flanary further observed that he felt that this was only fair, since all his predecessors had been able to rely on similar support. In this context, it becomes clear that this case involves the operation of the Virginia variant of the political substructure commonly known as the patronage system. To place the matter in clearer focus, the court notes that in many Virginia counties, a change in the political party controlling the Sheriff's office is often accompanied by a complete change of personnel in the deputy positions.[3] As discussed *infra*, such a "house cleaning" has long been considered permissible under the applicable Virginia law concerning appointment of Sheriff's deputies.

Subsequent to the assumption of office by Sheriff Harber, plaintiffs attempted to secure reinstatement to their previous positions of deputy sheriff. Initially, they filed grievances pursuant to § 15.1–7.1 of the Code of Virginia (1950), as amended. However, as currently constituted, the grievance mechanism established under § 15.1–7.1 is inapplicable to deputies of constitutional officers such as the Sheriff. However, on September 27, 1976, plaintiffs commenced this court action, alleging that defendant's course of conduct operated so as to deprive plaintiffs of certain rights guaranteed under the First and Fourteenth Amendments to the Constitution of the United States. Jurisdiction of this court is pursuant to 28 U.S.C. § 1343 and is uncontested. The action was originally brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988. In the complaint as eventually developed before this court, plaintiffs specifically allege that their employment as deputy sheriffs was discontinued solely because of their political affiliations and that the conduct of defendant operated so as to restrict and infringe upon plaintiffs exercise of their freedom of political belief and association.[4] In their initial complaint, plaintiffs sought injunctive, monetary, and declaratory relief. The court denied plaintiffs' motion for preliminary injunctive relief by order dated November 19, 1976, finding that since all plaintiffs had already become separated from service with the Sheriff's office, no showing of irreparable injury had been

unnecessary since they already held the positions.

**3.** However, in larger Sheriff's offices, it is not uncommon for deputies of the outgoing administration to be retained.

**4.** Prior to the trial of this case, the court granted plaintiffs' motion to dismiss, as party defendants, the members of the Lee County Board of Supervisors who had originally been named both individually and in their official capacities. The court also granted plaintiffs' motion to dismiss so much of their complaint as related to allegations of denial of procedural due process and equal protection.

made. The court also based this denial on the fact that an expedited trial date had already been granted. Plaintiffs subsequently appealed the court's denial of preliminary injunctive relief to the Court of Appeals for the Fourth Circuit, where such appeal is pending to date.

## RELEVANCE OF ELROD v. BURNS

In the development and trial of the issues of this case, both sides recognized the interplay of the recent United States Supreme Court decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Since the circumstances of *Elrod* are somewhat similar to those involved in the instant case, the court deems it relevant to summarize the holdings in *Elrod*, prior to a discussion of the factual issues and defendant's contentions in this case.

*Elrod* involved the actual discharge and threat of discharge allegedly suffered by several employees of the office of Sheriff in Cook County, Illinois, following a change of party in the position of Sheriff. The affected employees alleged that the conduct of Sheriff Elrod operated so as to violate rights secured under the First Amendment. The case reached the United States Supreme Court on Sheriff Elrod's appeal from an order of the Court of Appeals for the Seventh Circuit which overturned the judgment of the District Court denying preliminary injunctive relief.[5] In a divided majority opinion, the Supreme Court affirmed the judgment of the Seventh Circuit. Clearly, *Elrod* involved the operation of the Illinois system of political patronage.

Three of the Justices who comprised the majority in *Elrod* recognized a need to evaluate the propriety of the political patronage system in light of the safeguards of First Amendment freedoms established by such cases as *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Mr. Justice Brennan, joined by Mr. Justice White

and Mr. Justice Marshall, made the evaluation and found, *inter alia*, as follows:

"Patronage practice falls squarely within the prohibitions of *Keyishian* and *Perry*. Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association and dismissal only penalizes its exercise." 427 U.S. at 359, 96 S.Ct. at 2683.

Finding no compelling reasons for restraint of such freedoms, Mr. Justice Brennan deemed the patronage system to be constitutionally invalid.

Mr. Justice Stewart and Mr. Justice Blackmun concurred in the judgment of the other majority members. However, Mr. Justice Stewart, joined by Mr. Justice Blackmun, specifically found the circumstances of *Elrod* to be too narrow in scope so as to permit a definitive characterization of the constitutional status of all patronage systems. Nevertheless, Mr. Justice Stewart agreed with the plurality that the affected employees in *Elrod* had possibly suffered a denial of First Amendment freedoms. Relying on established precedent, Mr. Justice Stewart concluded as follows:

"The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing on the sole ground of his political beliefs. I agree with the plurality that he cannot. See *Perry v. Sindermann*, 408 U.S. 593, 597–598, 92 S.Ct. 2694, 33 L.Ed.2d 570." 427 U.S. at 375, 96 S.Ct. at 2690.

Mr. Chief Justice Burger, Mr. Justice Powell, and Mr. Justice Rehnquist joined in the dissent. Relying on the significance of the past role that patronage practices have played in the American democratic process, Mr. Justice Powell concluded, *inter alia*,

---

5. Unlike the instant case, several of the plaintiffs had not yet been separated from service in *Elrod*, thus creating a potential for irreparable harm. The opinion of the Seventh Circuit appears under *Burns v. Elrod*, 509 F.2d 1133 (7th Cir., 1975).

that the various States, acting in sound discretion, should be able to provide for employment in certain public offices, conditioned on partisan political affiliation. Mr. Justice Powell further reasoned that the states' interests in maintaining such practices are so significant as to justify an abridgement of First Amendment guarantees.

Mr. Justice Stevens took no part in the consideration and decision in *Elrod*.

## APPLICATION OF ELROD v. BURNS TO THE FORMULATION OF THE ISSUES IN THE INSTANT CASE

Given the division of the majority in *Elrod*, this court must recognize that a general assessment of the validity of the Virginia patronage system would necessarily involve a speculative trek through largely uncharted waters.[6] However, *Elrod* clearly represents a new development in constitutional law. Stated briefly, *Elrod* must stand for the proposition that the operation of a patronage system cannot be deemed so crucial to the conduct of the democratic system so as to permit a relaxation of certain First Amendment safeguards, as delineated by earlier case law. While Mr. Justice Stewart and Mr. Justice Blackmun were unwilling to review the ramifications of all patronage systems, there can be no doubt that *all five* majority members in *Elrod* found that the application of the Illinois system of patronage could be violative of First Amendment freedoms, given certain circumstances. The "lowest common denominator" in the majority opinion in *Elrod* must be considered to be that embodied in Mr. Justice Stewart's paraphrase of the rule of *Perry*: a nonpolicymaking, nonconfidential governmental employee cannot be discharged from a job that he is satisfactorily performing upon the sole grounds of his political beliefs. 427 U.S. at 375, 96 S.Ct. 2673. Implicit in this "common denominator" is the recognition that the patronage dismissal of a policymaking, confidential subordinate would, by necessity, involve broader considerations than mere political affiliation.[7]

In light of the above analysis, it becomes clear that the loss of employment through the operation of a patronage system must be evaluated on an individual basis. In order to conform to the "lowest common denominator", it is not enough to determine that the loss of employment occurred through what a finder of fact might perceive to be a patronage system. Rather, it must be determined (1) whether the affected employee served in a nonpolicymaking and nonconfidential capacity, (2) whether there is reason to believe that the affected employee was not sufficiently performing his duties so as to justify separation from employment, and (3) whether the affected employee was denied continued employment solely because of his political affiliations. While plaintiffs contended that their burden of proof under such a test was greater than that contemplated by the plurality in *Elrod* the court presented this case to the advisory jury in the form of a special verdict with questions designed to reach each of these factual issues. The court listed each of the eleven parties plaintiff in such a manner so that the jury might decide each factual issue as it related to each of the plaintiffs. In each instance and for each individual, the advisory jury rendered a verdict totally favorable to all plaintiffs.[8]

---

**6.** As discussed infra, the instant case permits a somewhat different variation of patronage practice in that the affected employees were not reappointed, rather than dismissed.

**7.** The inclusion of the criteria of "nonpolicymaking and nonconfidential" represents a logical evolution from *Perry* and *Keyishian* and was apparently necessitated by the varying circumstances of patronage dismissals. The plurality opinion in *Elrod* employs similar terminology. 427 U.S. at 367–368, 96 S.Ct. 2673. In this context, it is again clear that all five majority members in *Elrod* recognized a need to curb *some* patronage dismissals in favor of First Amendment rights.

**8.** The court also asked the advisory jury to determine whether defendant exercised good faith in his selection of deputies. The jury found that he had not. As discussed *infra*, the question was designed to assist the court in fashioning any equitable remedy that might prove to be appropriate.

## DEFENDANT'S MOTION FOR JUDGMENT N.O.V.

■ Throughout the development and trial of this case, defendant has maintained that the factual situation in *Elrod* is clearly distinguishable from the circumstances of the instant case. Defendant urges that the operation of the Virginia statute, governing appointment of deputy sheriffs, is such as to render plaintiffs' claim of First Amendment infringement totally frivolous. Section 15.1–48 of the Code of Virginia (1950), as amended, provides the only authority for the appointment of deputy sheriffs. *Board of Supervisors v. Lucas*, 142 Va. 84, 91, 128 S.E. 574, 576 (1925). The section provides, in pertinent part, as follows:

> "*Appointment of deputies; their powers; how removed.*—The . . . sheriff of any county or city, . . . may at the time he qualifies as provided in § 15.1–38 or thereafter appoint one or more deputies, who may discharge any of the official duties of their principal during his continuance in office, unless it be some duty the performance of which by a deputy is expressly forbidden by law. . . . The officer making any such appointment shall certify the same to the court in the clerk's office of which the oath of the principal of such deputy is filed and a record thereof shall be entered in the order book of such court. Any such deputy at the time his principal qualifies as provided in § 15.1–38 or thereafter, and before entering upon the duties of his office, shall take and prescribe the oath now provided for county officers. . . . Any such deputy may be removed from office by his principal. . . ."

It is clear that under the provisions of § 15.1–48, the terms of the deputies of constitutional officers in Virginia end with the term of their principal. *Farmers' Bank of Southwest Virginia v. McGavock*, 119 Va. 510, 89 S.E. 949 (1916). Thus, even had Sheriff

Harber decided to retain one of Sheriff Flanary's deputies, that deputy would have had to requalify as well as take and prescribe the appointment oath.[9] In his motion for judgment n. o. v., defendant has reaffirmed his reliance on § 15.1–48 in that he would have the court reject the advisory jury's findings.

Defendant makes several contentions relating to § 15.1–48. Two of these contentions are interrelated and make the stronger argument. Defendant correctly observes that *Elrod* was concerned with patronage *dismissal.* In the instant case, the actual separation from employment occurred through the operation of law. Consequently, defendant reasons that plaintiffs could not have possibly suffered a loss of employment due to the exercise of rights guaranteed under the First Amendment. In a slightly different context, defendant urges that § 15.1–48 completely wipes the slate clean as regards an incoming Sheriff's choice of deputies. Given the wide discretion vested in the Sheriff by virtue of § 15.1–48, defendant insists that there was no duty to continue the employment of the deputies of the defeated principal.[10]

■ The court finds defendant's position to be without merit. The mere fact that plaintiffs had no vested right to reappointment cannot be dispositive of their claim of constitutional infringement. On several occasions, the United States Supreme Court has ruled that a nontenured school teacher could not be denied contract renewal solely because of the teacher's exercise of rights protected under the First and Fourteenth Amendments. E. g. *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Keyishian v. Board of Regents, supra; Perry v. Sindermann, supra.* Indeed, it would seem that the potential for abuse of First Amendment freedoms is accentuated when the decision as to reappointment is totally within the discretion of the appointing authority. See *Shel-*

9. At trial, it became evident that plaintiffs understood the mandates of § 15.1–48 in that they realized that their formal roles ended with the expiration of Sheriff Flanary's term.

10. Traditionally, principal officeholders in Virginia have been deemed to enjoy great discretion in personnel decisions. See, e. g., *Hoge v. Trigg*, 4 Munf. (18 Va.) 150 (1814).

*ton v. Tucker, supra,* 364 U.S. at 486, 81 S.Ct. 247. Thus, the fact that plaintiffs had no right to expect reappointment is insufficient, in itself, to preclude a First Amendment action.[11] As concluded above, a clear majority of the Court in *Elrod v. Burns, supra,* found that a State's interest in preserving its patronage system was not so great as to permit a relaxation of First Amendment safeguards. Consequently, the court is unable to perceive any difference in the test to be applied when the lack of expectancy interest arises out of the operation of contract renewal and when, as here, the lack of expectancy interest arises through the operation of statute.

■ It is clear that in First Amendment actions, the *reason* for dismissal or failure to reappoint presents the crucial question. Defendant contends that § 15.1–48 must be read so as to permit an appointing principal in Virginia to employ unbridled discretion in making his choice of deputies. Defendant maintains that since the Flanary deputies were automatically terminated at midnight on December 31, 1975, he owed them no further consideration. However, the court must find that, under the law, such unbridled discretion simply does not exist. In *Perry v. Sindermann, supra,* the Supreme Court characterized the state of the law as follows:

"For at least a quarter of a century, this court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on the basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." 408 U.S. at 597, 92 S.Ct. at 2697.

Stated briefly, while Sheriff Harber could have refused to consider continued employment for the Flanary deputies for numerous and valid reasons, he could not refuse consideration for the wrong reasons. It was not enough for Sheriff Harber to redirect plaintiffs' queries concerning their job status to their "lame duck" principal. Furthermore, it was not enough for the defendant to blindly rely on the patronage practices established over the course of decades, even centuries, if those practices had degraded to no more than purely political manipulations. Finally, while the Commonwealth of Virginia may have wisely chosen to vest broad discretion in its various constitutional officers as to matters of personnel appointment and discharge, this court is unaware of any authority supportive of the proposition that such discretion may take precedence over the paramount freedoms of speech and association.

■ The last contention raised by defendant under § 15.1–48 concerns the nature of the duties of deputy sheriffs in Virginia. Defendant argues that § 15.1–48 serves to vest in the deputy sheriffs powers coextensive with those of the Sheriff.[12] Consequently, defendant urges that deputy sheriffs are policymakers by definition and thus excluded from the rule of *Elrod v. Burns, supra.* There can be no doubt that § 15.1–48 grants deputies of constitutional officers the authority to perform numerous "official" and perfunctory duties incumbent to the office. *Farmers' Bank of Southwest Virginia v. McGavock, supra,* 119 Va. at 517,

---

11. It has also been held that an employee who has received his job through operation of a patronage system could be viewed to be precluded from raising objection to a loss of his job through operation of the same system. *Nunnery v. Barber,* 503 F.2d 1349, 1359 (4th Cir., 1974), cert. denied 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975); *Alomar v. Dwyer,* 447 F.2d 482, 483–484 (2d Cir., 1971), cert. denied 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972). However, inasmuch as the United States Supreme Court has now applied the ra-

tionale of *Perry* to the context of political patronage, such an implied waiver is obviously not relevant. See *Nunnery v. Barber, supra,* at 1361 (dissenting opinion of Circuit Judge Butzner).

12. Section 15.1–48 provides that deputies ". . . may discharge any of the *official* duties of their principal during his continuance in office, unless it be some duty the performance of which by a deputy is expressly forbidden by law." (Emphasis added.)

89 S.E. at 951. If a deputy sheriff could not make a valid service of court papers, he would be of little value to his principal. In this sense, " . . . a sheriff and a deputy sheriff are one." *Board of Supervisors v. Lucas, supra*, 142 Va. at 91, 128 S.E. at 576. However, there can be no doubt that the Sheriff is designated, both under the Virginia statutory scheme and in the eyes of the public, as the official in charge. Indeed, § 15.1–48 specifically recognizes that some of the Sheriff's duties may be expressly forbidden to deputies by law. The deputies are no more than appointees and clearly can be held answerable to their principal. Of course, some Sheriffs may choose to delegate great discretion in the policymaking realm to certain of their deputies. For example, Sheriff Flanary could have allowed his chief deputy, who supervised the office at night, to have exercised some role in policy formulation. If so, the chief deputy would have no grounds for redress under *Elrod v. Burns, supra*. It is clear that the question turns on the circumstances of individual cases in individual Sheriff's offices. Consequently, the court concludes that the issue of the status of plaintiffs as policymakers presents factual questions which are properly before the court for resolution.

In summary, the court must hold that defendant's reliance on § 15.1–48 is misplaced. Section 15.1–48 provides an incoming Sheriff the opportunity to exercise some discretion in personnel selections, reappointments, and terminations. However, there is no provision for the exercise of absolute discretion. Indeed, the law requires otherwise. Obviously, § 15.1–48 need not be read so as to permit a constitutionally prohibited abuse of discretion. Moreover, the automatic termination provisions of § 15.1–48 do not serve as a bar to a First Amendment action. Finally, the mere

fact that deputy sheriffs are authorized to act in the name of their principal does not necessitate a finding, as a matter of law, that such deputies are invariably policymakers within their respective offices. Inasmuch as it relates to arguments made under § 15.1–48, defendant's motion for rejection of the advisory jury's verdict is denied.

Section 15.1–48 is best viewed as essentially mechanical in nature, barren of any far-reaching policy judgments on political configuration. Specifically, the court is unaware of any authority supportive of the proposition that § 15.1–48 was *intended* to embody or lend support to the Virginia system of political patronage. While the operation of § 15.1–48 has undoubtedly shaped the development of Virginia patronage practices, the relationship is not symbiotic in nature. Section 15.1–48 has meaning and validity far removed from the purely political context.[13] Indeed, the court perceives that the automatic termination provisions could be employed by a newly elected Sheriff or, for that matter, a reelected incumbent, so as to provide a simple and expedient means of discontinuing incompetent deputies. While some observers might still regard such a coup as an exercise of "patronage", the test of the constitutional validity of the practice must be in the substance, not in the characterization. All that smacks of patronage cannot necessarily be deemed evil.[14] The facts and circumstances must be viewed in the individual context. Accordingly, the court finds that this case embodies factual issues which were properly submitted to an advisory jury and which are now properly before the court for resolution. Defendant's various motions for favorable judgment, premised on § 15.1–48, have been properly denied.

---

**13.** In their original complaint, plaintiff would have this court declare § 15.1–48 unconstitutional, inasmuch as the section permits patronage practices. Obviously, such a declaration is inappropriate if for no other reason than the fact that the court has found the statute to be subject to a constitutionally acceptable interpretation. See, e. g., *Ashwander v. T.V.A.*, 297

U.S. 288, 347–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

**14.** In this sense, the court has again received guidance from the concurring opinion of Mr. Justice Stewart in *Elrod v. Burns, supra*, 427 U.S. at 374, 96 S.Ct. 2673 and from the dissenting opinion of Circuit Judge Butzner in *Nunnery v. Barber, supra*, at 1360–1362.

## FACTUAL DETERMINATIONS

The advisory jury found that plaintiffs had met their burden of proof as to each of the requisite elements in the test as described above. The court now proceeds to evaluate the evidence and make appropriate findings of fact.

■ The evidence clearly reveals that each of the named plaintiffs was performing in a satisfactory manner at all times prior to the cessation of employment on December 31, 1975. Indeed, there is no evidence to the contrary and defendant does not dispute the point. The greater weight of the evidence also establishes that each of the named plaintiffs, including Chief Deputy Onza Collier, was performing in a nonpolicymaking and nonconfidential capacity while serving as a deputy sheriff under Sheriff Flanary.[15] The testimony of the deputies revealed that each individual had clearly assigned duties and responsibilities. Several of the "road deputies" were exclusively assigned to specific areas of the county. However, in each case, their freedom of action was limited by the mandates of Sheriff Flanary. At the most, the only discretion exercised by the deputies was in purely ministerial matters, such as when to arrest a drunk or when to drive the drunk home. The decision that such discretion might be exercised by the deputies was solely that of Sheriff Flanary. While Chief Deputy Collier was in charge of the office in the absence of the Sheriff, the testimony of Flanary and Collier revealed that Collier would leave any policy questions that might arise until the return of the Sheriff. The evidence further reveals that Sheriff Flanary did not confide in his deputies in matters of general administrative operation and policy formulation. Clearly, the preponderance of the evidence establishes that the deputies merely implemented policy set forth by their principal.

Finally, the court considers whether the defendant refused to consider the plaintiffs for reappointment solely because of plaintiffs' political beliefs and affiliations. In this context, it is relevant to note what is and what is not at issue. Much of the evidence adduced at trial related to Sheriff Harber's criteria for the selection of new deputies. At best, Sheriff Harber's testimony as to these criteria is generously described as confused. Indeed, it is the court's opinion that it was defendant's testimony on this matter that led to the advisory jury's finding of "bad faith" on the part of Sheriff Harber in his selection process.[16] Sheriff Harber may or may not have selected his new deputies on the basis of their political affiliation. The court need not make a finding on this point. The relevant inquiry concerns whether the *old* deputies were excluded from consideration solely because of their political stance. All parties must agree that if Sheriff Harber did not exclude the plaintiffs for purely political reasons, it would have represented a radical departure from past practice, as described by numerous witnesses. Moreover, defendant's response to plaintiff's queries during the interim period is most telling. The plaintiffs were to take their questions to their defeated principal. The implication was clear: he (Harber) had been elected through the support of his party—Flanary had been defeated and the sorry state of affairs suffered by Flanary's employees was not to be placed at Flanary's door. In such circumstances, merit, training, and ex-

---

**15.** Numerous commentators have recognized that the term "policymaker" presents an elusive factual question. See, e. g., *Nunnery v. Barber supra; Illinois State Employees Council 34, etc. v. Lewis,* 473 F.2d 561 (7th Cir., 1972), cert. denied 410 U.S. 928 and 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609 (1973). Obviously, the term may assume different connotations in different forms of employment. For purposes of the present case, the court has considered a policymaker to be one who controls or exercises a role in the decision making process as to the goals and general operating procedures of the office. For example, the decision to make a specific arrest would be a nonpolicymaking act while a decision to concentrate on certain types of crime would be that of a policymaker. The court has also assumed that one may become a policymaker specifically, by delegation of authority, or tacitly, by gradual ascendancy.

**16.** See n.8, *supra*.

perience were to be extraneous considerations. The court must find that the preponderance of the evidence, and the inferences reasonably drawn therefrom, establishes that plaintiffs were refused consideration for reappointment solely because of their political beliefs and affiliations.

Before leaving the factual circumstances, the court deems it relevant to comment on the impact of the operation of the Virginia patronage system, as manifested in the instant case. In the plurality opinion of *Elrod v. Burns, supra*, Mr. Justice Brennan found that the reasons commonly advanced in support of patronage practices are not so persuasive as to suggest legitimate grounds for the curbing of First Amendment freedoms. 427 U.S. at 364–373, 96 S.Ct. 2673. Indeed, Mr. Justice Brennan noted that " . . . if patronage contributes at all to the elective process, that contribution is diminished by the practice's impairment of the same." Id., at 370, 96 S.Ct., at 2688. The court finds that the same considerations apply to the Virginia patronage practices, at least as exhibited in the instant case. Moreover, it appears to this court that the patronage practices applied in this case are even more repugnant to sound governmental administration than the system practiced in Illinois. The court is unable to conceive of any possible justification for a *sweeping* change of deputies in the small Lee County Sheriff's Office.[17] Most of the old deputies had undergone extensive and expensive training. Indeed, it would seem that a radical change of staffs would impair the efficiency and conduct of ongoing criminal investigations. Under the old system, an incoming Sheriff must labor under great pressure, given the expectations of many members of his party and his campaign workers. The morale of lame duck deputies must necessarily plummet, since they must expect separation from employment regardless of the quality of their past services. Finally, the efficiency of the Sheriff's Office during an election period is certainly impaired when the vari-

ous deputies know that their jobs may well depend on how much time they are able to devote to the incumbent party's campaign.

■ In summary, the operation of the Virginia system of patronage, as manifested in the instant case, can only be viewed as dysfunctional, stifling, and counter-productive. As it affected plaintiffs in this case, the court must decide that the system is also constitutionally invalid. Moreover, the court is unable to perceive any indication, either in law or fact, that Virginia has a greater state interest in maintaining its patronage system than does the State of Illinois.

## RETROACTIVITY OF ELROD v. BURNS

Predictably, the parties are at great odds as to the proper disposition to be made in this case. Defendant would have this court declare *Elrod v. Burns, supra* to be nonretroactive inasmuch as it applies to prohibited acts which took place prior to the announcement of the decision on June 28, 1976. Defendant contends that the traditional acceptance of patronage practice, coupled with certain earlier court decisions, operated so as to create a "reliance interest" sufficient to prohibit retrospective application. Plaintiffs argue that *Elrod* is obviously intended to be applied retrospectively since the decision is premised on the strictures of such well known and frequently cited cases as *Perry v. Sindermann, supra* and *Keyishian v. Board of Regents, supra.*

As Mr. Justice Clark noted in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the doctrine of nonretroactivity is a modern innovation, generally not accepted at common law. It would seem that the growth of the doctrine has paralleled the developing notion of law as a dynamic institution. In any case, the doctrine is now applied to certain situations involving changes in constitutional interpretation. Most frequently applied in criminal matters, the doctrine has been invoked to protect state actions taken under a consti-

---

17. In Illinois, old deputies could apparently retain their positions if they could command or solicit support from leaders of the incoming party. *Elrod v. Burns, supra* at 351, 96 S.Ct. 2673.

tutional principle that is premised on subsequently rejected decisional law. E. g., *Linkletter v. Walker, supra,* refusing retrospective application of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which overruled *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), refusing retrospective application of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The doctrine has been deemed applicable to civil cases, *Linkletter v. Walker, supra,* 381 U.S., at 627, 85 S.Ct. 1731, and has been so applied e. g., *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). On occasion, the doctrine has been invoked to protect action taken prior to the declaration of a statute's unconstitutionality. E. g., *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

A review of the relevant cases reveals that the Supreme Court has considered three factors to be relevant in the determination of the proper time-frame for the application of new law. The Supreme Court will inquire into the prior history of the rule in question; its purpose, impact, and best means of effecting its objective; and the degree and nature of reliance engendered by the old rule. See *Linkletter v. Walker, supra.* As noted above, defendant has placed primary emphasis on the reliance interest created through the tradition of political patronage.

■ Defendant is undoubtedly correct in observing that patronage practice has played a role in Virginia politics for many, many years. Opportunistically, defendant reads *Elrod v. Burns, supra* to reveal that such learned personages as Mr. Chief Justice Burger, Mr. Justice Powell, and Mr. Justice Rehnquist could not perceive that the mandates of *Perry v. Sindermann, supra* and *Keyishian v. Board of Regents, supra* were to be extended beyond the sanctity of the patronage system. How then, defendant reasons, could he, a county sheriff-elect and ex-coal miner, know that the patronage system, employed by his predecessors, was foreclosed to him? Moreover, defendant notes that the applicable law in the Fourth Circuit in the fall of 1975 was that expressed in *Nunnery v. Barber,* 503 F.2d 1349 (4th Cir., 1974), cert. denied 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975), in which it was found *inter alia,* that correction of patronage abuse was a matter of legislative concern. Thus, defendant would have this court conclude that he is protected through a reliance interest.

While the court considers defendant's arguments relevant for certain purposes as described *infra,* the court is unable to conclude that the factors assigned by defendant are sufficient for a finding of a reliance interest as contemplated in *Linkletter v. Walker, supra* and its progeny. Defendant was not acting in reliance on a decision of the United States Supreme Court. While defendant was undoubtedly acting under color of state law, the statute in question is relatively innocuous in that it authorizes no more than an exercise of some discretion. Clearly, neither of the classic elements of reliance interest are present in the instant case; *Elrod v. Burns, supra* did not overrule an existing Supreme Court precedent nor did it declare any statute to be unconstitutional. The court recognizes that under the criteria for nonretroactivity described in *Linkletter v. Walker, supra,* other relevant circumstances must be examined. While the age of patronage tradition operates in the defendant's favor, a survey of the recent history of the practice reveals that the strength of the tradition has by no means remained absolute. Opportunities for the exercise of patronage have largely been whittled away by the growth of civil service systems and merit plans, both in Virginia and nationwide. Given such manifestations of disfavor and given such clear limitation on the use of discretion in personnel matters as expressed in *Keyishian* and *Perry,* the court must find that defendant should have reasonably suspected that he could not act with impunity.

As to defendants reliance on the decision in *Nunnery v. Barber, supra,* there is support for the proposition that conflict among

courts as to a rule of law is sufficient to diminish the potential for a reliance interest. Cf. *Roberts v. Russell*, 392 U.S. 293, 295, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); *United States v. Estate of Donnelly*, 397 U.S. 286, 295, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970). While the Court in *Nunnery* was able to distinguish *Illinois State Employees Union Council 34, etc. v. Lewis*, 473 F.2d 561 (7th Cir., 1972) cert. denied 410 U.S. 928 and 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609 (1973) on the facts, there could be no doubt that a conflict existed among the various circuits when the Court of Appeals for the Seventh Circuit rendered its decision in *Burns v. Elrod, supra*. Since *Burns v. Elrod*, specifically concerned deputy sheriffs, the significance of the case should have been obvious to anyone who was familiar with *Nunnery v. Barber, supra*.

Given the circumstance that patronage practice has been generally on the wane in recent years and given the fact that *Elrod v. Burns, supra* clearly represents an expansion of earlier case law, the court must decide that the principles of *Elrod* should properly be given retroactive application, within the confines of the applicable statute limitations for actions predicated on 42 U.S.C. § 1983. As noted above, *Elrod* did represent a new development in constitutional law in that a state's interest in its patronage system was found to be of insufficient magnitude so as to justify abridgement of First Amendment freedoms. However, defendant had no particular reason to believe otherwise. While there was case law to indicate that patronage abuses might be of legislature concern, such holdings were by no means uniform. Furthermore, inasmuch as *Elrod* stands for the expansion of principles governing protection of First Amendment freedoms, the court finds that the purpose of *Elrod* will be best served by retrospective application.

In considering the question of retroactive application, the court has remained cognizant of two recent Circuit Court decisions which specifically concern the impact of *Elrod v. Burns, supra*. In *Nunnery v. Barber*, Civil Action Number 73–2502 (4th Cir., March 18, 1977) (*Nunnery II*), plaintiff had applied for leave of the Court of Appeals for the Fourth Circuit to allow the District Court to reconsider her case, pursuant to Fed.R.Civ.P. 60(b), in light of *Elrod*.[18] *Nunnery* had previously exhausted her appeal of the adverse decision of the District Court. In *Nunnery II*, the Fourth Circuit held that a change in a rule of law, occurring after judgment becomes final, is an insufficient ground for reopening of the judgment under Rule 60(b). Moreover, the Fourth Circuit further noted in *Nunnery II* that " . . . *Elrod* contains no indication or suggestion that the Supreme Court intended its decision to have retroactive effect . . .." (Slip Opinion at 5). However, this court is not convinced that the doctrine of nonretroactivity has progressed to the extent that the Supreme Court's silence as to the question will create a presumption of prospective design. Indeed, in the vast majority of Supreme Court cases providing for nonretroactivity, the Court has found it necessary to decide the question in a case considered subsequent to the decision that is to be applied nonretroactively. It is this court's understanding that, as a general rule, the law in effect at the time of a court's decision must be applied, absent considerations of manifest injustice or clear and binding intent to the contrary. Cf. *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Moreover, it is clear that the Court of Appeals for the First Circuit had absolutely no difficulty with a retroactive application of *Elrod* in the recent case of *Rivera Morales v.*

---

**18.** The Court of Appeals for the Fourth Circuit had previously affirmed the District Court's decision upholding the patronage dismissal of plaintiff. *Nunnery v. Barber, supra* (*Nunnery I*). As noted above, it was the opinion of the Fourth Circuit that patronage abuses are matters of legislative concern. Furthermore, citing *Alomar v. Dwyer*, 447 F.2d 482 (2nd Cir., 1971), cert. denied 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972), the Fourth Circuit found that plaintiff implicitly waived her right to complain of her patronage dismissal when she accepted her employment under the same practice.

*Benitez de Rexach*, 541 F.2d 882 (1st Cir., 1976). While the District Court had found for plaintiff on grounds of denial of substantive due process, the First Circuit determined that the case involved a patronage dismissal that was prohibited by *Elrod.* Even though the dismissal took place approximately three years prior to the decision in *Elrod*, the First Circuit apparently found it unnecessary to even consider the question of retroactivity of the decision.

■ The court has considered one final and crucial factor in its determination as to the retroactive application of *Elrod.* The court perceives the problem of retroactivity in a case such as this to involve a balancing of interests of the respective parties. Cf. *Lemon v. Kurtzman, supra.* If retroactivity were to be denied, it could be said that a manifest injustice would be done to plaintiffs. There can be no doubt that plaintiffs had decided to contest their loss of employment, even before the Supreme Court announced its decision in *Elrod.* Given the Supreme Court's resolution of that matter, it is at least arguable that plaintiffs could have eventually prevailed on the bases of *Perry* and *Keyishian*, even in the absence of *Elrod.* On the other hand, defendant would undoubtedly suffer a manifest injustice if plaintiffs are accorded the full measure of relief for which they pray. While defendant obviously acted with less than full knowledge of all the relevant law and circumstances, his actions were consistent with the highly political context within which he operated. A pawn of political inertia, defendant would suffer greatly if he were made to bear the full extent of plaintiffs' losses. Faced with the unhappy task of balancing the relative injustices to be suffered by the parties, the court takes solace in the fact that the primary relief to be accorded in this case falls within the province of equity. Given such a circumstance, the prospect of retroactive application can be viewed as less onerous. Armed with the potential for shaping its equitable

remedies in accordance with the needs of the parties and the realities of the case, the court must conclude that retroactive application will best serve to protect the interests of all parties and to advance the purpose of *Elrod.*[19]

## PLAINTIFFS' REMEDIES

■ In their original complaint, plaintiffs sought injunctive, monetary, and declaratory relief. For reasons stated above, the court has determined that declaratory relief is inappropriate. However, inasmuch as the court has found that defendant unlawfully refused to consider plaintiffs for reappointment as deputy sheriffs, the court must determine that plaintiffs are entitled to reinstatement to their former positions. The court recognizes that immediate reinstatement would work a hardship in the management of the small Lee County Sheriff's Office. Consequently, the court will order and decree that reinstatement shall be effected as of 12:01 A.M. on June 1, 1977. Prior to that date, the defendant shall afford each of the named plaintiffs the opportunity to requalify, as well as take and prescribe the appropriate oath, pursuant to § 15.1–48 of the Code of Virginia (1950), as amended. Upon reinstatement, each plaintiff shall enjoy at least the same remuneration, privileges, and benefits as he did at the time of his separation from employment.

Plaintiffs also seek compensation for their lost wages. Reimbursement of back wages fall within plaintiffs' equitable remedy of reinstatement. See, e. g., *Jinks v. Mays*, 464 F.2d 1223, 1226 (5th Cir., 1972). However, it does not follow that back wages should be reimbursed to prevailing plaintiffs as a matter of course. *Jinks v. Mays, supra* at 1226; *Wright v. Southeast Alabama Gas District*, 376 F.Supp. 780, 782 (M.D.Ala., 1974). To hold defendant solely responsible for the back wages of all the plaintiffs would be both unrealistic and un-

---

**19.** The broad discretionary authority of the court in shaping equitable decrees is well established. See, e. g., *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1940).

fair. The court has found that while defendant was acting in ignorance of relevant case law and recent circumstances surrounding patronage practices, defendant was merely responding to the expectations of those to whom he felt he owed a duty. While it is impossible to determine that defendant acted in good faith, it is also impossible to conclude that he acted in bad faith.[20] The plaintiffs themselves fully expected that their requests for consideration by Sheriff Harber would be futile. In the abstract, it was possible that trained legal authorities could have foreseen the expansion of *Keyishian* and *Perry* that was eventually embodied in *Elrod*. However, such considerations were far removed from the highly volatile political environment of Lee County, Virginia, into which Sheriff Harber was thrust as a relative novice. A court sitting in equity must take cognizance of the realities of the situation. Exercising discretion on the basis of what are perceived to be sound equitable principles, the court must decide that plaintiffs shall not be reimbursed for lost wages.

Plaintiffs also seek an award of monetary damages. However, the court finds that no proof of actual damages has been made. Moreover, given the circumstances of this case, the court finds that an award of punitive, exemplary, or nominal damages is inappropriate.

Finally, plaintiffs pray for recovery of attorney's fees. Under 42 U.S.C. § 1983, an allowance of attorney's fees is within the discretion of the court. Considering all relevant circumstances of this case, the court determines that in order to do justice between the parties, plaintiffs will be allowed reasonable attorney's fees in the sum of Fifteen Thousand Dollars ($15,000).

## CONCLUSION

The foregoing shall constitute the court's findings of fact and conclusions of law. An appropriate judgment and order will enter this day.

**20.** As noted above, the court has determined that the advisory jury's finding of bad faith on the part of defendant in his selection process

was made in response to questions not at issue. See n.9, *supra*.