**Aaron FINKEL and Alan Tabakman, Plaintiffs,**

v.

**Peter BRANTI, Jr., as Public Defender, Rockland County, Defendant.**

No. 78 Civ. 14 (VLB).

United States District Court, S. D. New York.

Sept. 29, 1978.

Freedman, Wray, Wagner & Tabakman, New City, for plaintiffs.

Marc L. Parris, County Atty., The County of Rockland, New City, for defendant.

Opinion

VINCENT L. BRODERICK, District Judge.

I.

Plaintiffs, Aaron Finkel and Alan Tabakman, are Assistant Public Defenders ("Assistants") employed by the County of Rockland, New York. Defendant Peter Branti is the Public Defender for Rockland County. Finkel and Tabakman were appointed to their positions as Assistants on March 26, 1971 and September 5, 1975, respectively.

The six-year term of the Public Defender expired on December 31, 1977. Frank P. Barone, a Republican, had served in that position since January 1, 1972. He had been appointed by a Republican-dominated County Legislature. In 1973 the Democrats gained control of the Rockland County Legislature, and in the 1977 election (County legislators serve four-year terms) a Democratic majority was again elected.[1]

---

1. Of the eighteen members of the Rockland County Legislature elected in 1977 to serve from January 1, 1978 through December, 1981, eleven are Democrats.

Defendant Branti, a Democrat, had been an Assistant District Attorney for Rockland County. He was selected as Public Defender by the Democratic caucus of the County Legislature, and was appointed by the Legislature on January 3, 1978. On that date, he began the process of executing termination notices for six of the nine Assistants who had served under Barone.[2] Plaintiffs were among the six Assistants whose employment Branti sought to terminate.

On January 4, 1978, plaintiffs commenced this action and, by order to show cause, sought a temporary restraining order and a preliminary injunction enjoining defendant from terminating plaintiffs' employment and from attempting to alter plaintiffs' employment status. Plaintiffs alleged that they were non-policymaking, non-confidential government employees who were satisfactorily performing their duties and that, therefore, defendant's attempt to replace plaintiffs on political grounds violated the First and Fourteenth Amendments.[3]

On January 4, 1978, I issued the requested temporary restraining order, which was to remain effective pending the development of a factual record at a hearing that was to be held on January 6, 1978. That hearing was held, but the evidence presented was, in my judgment, insufficient to enable me to resolve the difficult issues presented. I scheduled further hearings, which were held on January 24, 25, 26, 27 and 30, and February 8 and 10, 1978. Pursuant to Rule 65, Fed.R.Civ.P., and upon the consent of all the parties, the plenary trial was advanced and consolidated with the hearing on the preliminary injunction.

## II.

The question to be decided herein may be narrowly stated as follows: Are plaintiffs non-policymaking, non-confidential government employees who, solely for political reasons, are threatened with removal from jobs they are competent to perform and have been satisfactorily performing? See *Elrod v. Burns,* 427 U.S. 347, 375, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Stewart, J., concurring). On the basis of the evidence presented at the hearings and the applicable law, I find that the answer to this question is "yes," and I conclude that defendant Branti must be enjoined from terminating or attempting to terminate plaintiffs' employment upon the sole grounds of their political beliefs.[4]

2. The nine incumbents and their respective party affiliations in 1977 were as follows:

| | |
|---|---|
| Aaron Finkel | Republican * |
| James A. Fitzgerald | Democrat |
| Stuart M. Leudan | Democrat |
| John F. McAlevey | Democrat |
| William K. Nelson | Democrat |
| Manuel Sanchez | Not Registered |
| Barnet S. Selman | Republican |
| Alan Tabakman | Republican |
| William F. Wray, Jr. | Republican |

Only McAlevey, Nelson, and Sanchez were reappointed.

* In February, 1977, Finkel, at the suggestion of the District Attorney of Rockland County, a Democrat, filed a change of party registration from Republican to Democrat, such change to become effective January 1, 1978. Finkel hoped thereby to enhance his chances of being reappointed as an Assistant when a new Public Defender, expected to be a Democrat, was appointed.

The record in the instant case shows, however, that despite Finkel's change in party registration, he was regarded by the relevant parties to be a Republican during the period herein in issue.

3. Plaintiffs do not allege a basis for federal jurisdiction in their pleadings. I shall construe this action, which is clearly based on *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), to be brought pursuant to 42 U.S.C. § 1983, with jurisdiction being based on 28 U.S.C. § 1343(3).

4. On January 4, 1978, I signed a temporary restraining order that restrained defendant "from terminating or attempting to terminate, alter, change or in any way affect plaintiffs' current employment status as of December 31, 1977 as Assistant Public Defenders for the County of Rockland. . . ." That restraining order remained in effect through the trial, and, on the last day of trial, I stated that that order would stay in effect until decision was rendered. Therefore, the injunction that is issued herein makes permanent the order of January 4, 1978.

Because there has been some dispute as to the interpretation of the January 4, 1978 order, I want to make clear that compliance with the judgment to be entered herein will require defendant both to permit plaintiffs to work as

### III.

The Rockland County Public Defender is appointed by the County Legislature for a term of six years. Assistants are appointed by the Public Defender, and they serve at his pleasure. The County Legislature makes appropriations for the salaries to be paid to Assistant Public Defenders.

Plaintiff Finkel has been employed as an Assistant since March 26, 1971, at which time he was appointed by Public Defender Arnold Becker, a Democrat. In January, 1972, Finkel was continued in office by Barone, who was a registered Republican who had been named as Public Defender by the Republican-dominated Legislature after Becker's term had expired. Barone served a full six-year term, and Finkel was an Assistant during that entire period. Throughout the course of his employment as an Assistant, Finkel himself has been a registered Republican.[5]

Plaintiff Tabakman was appointed as an Assistant by Public Defender Barone in September, 1975. At that time Tabakman was, and he has since then remained, a registered Republican.

There are some 2,000 public employees in Rockland County, falling into categories of "unclassified" and "classified." The unclassified category consists of teachers and elected officials—legislators and the District Attorney. The classified category has four subdivisions:

    a)  a competitive class with minimum qualifications and competitive civil service examinations;

    b)  a non-competitive class with minimum qualifications but no examination;

    c)  a labor class, consisting of unskilled labor.

    d)  an exempt class, for which no examination is deemed practicable or feasible.[6]

There is no executive in Rockland County; the Legislature performs the function of executive in appointing department heads, and members of the exempt class are generally appointed by a department head. Included in the less-than-50 employees who fall into the exempt class are Assistant County Attorneys, who are appointed by the County Attorney (who is in turn appointed by the Legislature), and Assistant Public Defenders, who are appointed by the Public Defender.

As a practical matter, appointments by the Legislature were decided upon, after the 1977 elections returned a Democratic majority of legislators, by the Democratic caucus. In November and December of 1977, the Democratic caucus of the Legislature decided it would allocate coveted positions on a town basis. The positions covered by these allocations included not only those positions which were clearly within the appointing authority of the Legislature, such as Chairman of the Legislature, County Clerk, County Attorney, and Public Defender, but also positions which were clearly not, such as Assistant County Attorneys and Assistant Public Defenders.

The Chairman of the Legislature and the County Clerk were from the Town of Ramapo, and the County Attorney and the Public Defender, Branti, were from the Town of Haverstraw. The Democratic caucus therefore decided that the attorney positions in the County Attorney's Office and in the Public Defender's Office would be filled by persons selected by the Democratic legislators or Democratic town chairmen

---

Assistants and to pay them the normal Assistant's salary. Mere payment of plaintiffs' salary will not constitute full compliance with the judgment entered herein; for plaintiffs' constitutional right, which is upheld herein, is the right not to be dismissed from public employment upon the sole ground of their political beliefs. Defendant cannot infringe that right of plaintiffs with impunity by the mere expedient of paying plaintiffs a sum of money.

**5.** *See* note 2, *supra.*

**6.** James K. Anderson, Personnel Officer of Rockland County, testified that with respect to the exempt class no examinations are feasible since the positions in this class are those of a deputy or a person in a confidential relationship to his principal.

from Rockland County's towns on the following bases:

Ramapo—six attorneys
Clarkstown—four attorneys
Orangetown—one attorney
Stony Point—one or two attorneys
Haverstraw—none.[7]

The names selected were to be submitted to the appointing authority by the Democratic chairperson of the County.

Branti, after appointment as Public Defender, appointed six new Assistants and retained three who had been in the office under Barone. With one possible exception, all the attorneys appointed or retained by Branti were selected on the basis that had been decided upon by the Democratic caucus. With one exception, all were Democrats.

The names of the nine 1978 appointees for Assistants, their political affiliations, and the way in which the names were submitted are as follows:

(1) John E. Allison; newly appointed—submitted by Clarkstown delegation of the Legislature. Democrat.

(2) Lorna R. Bernard; newly appointed—submitted by Democratic chairman of Orangetown. Democrat.

(3) Gerard M. Blumenfeld; newly appointed—submitted by Harriet Cornell, Chairperson of the Rockland County Democratic Committee. Democrat.

(4) John A. Costa; newly appointed—submitted by Clarkstown delegation of the Legislature. Democrat.

(5) Wayne R. Feinberg; newly appointed—submitted by Stony Point delegation of the Legislature. Democrat.

(6) John F. McAlevey; retained—submitted by Ramapo delegation of the Legislature. Democrat.

(7) John M. McCabe; newly appointed—submitted by a legislator from Haverstraw. Democrat.

(8) William K. Nelson; retained—submitted by Clarkstown delegation of the Legislature. Democrat.

(9) Manuel Sanchez; retained—Frank Mascola, a Republican and Chairman of the County Legislature in 1973, had proposed Sanchez's name to Democratic Legislator Goodfriend of Ramapo. Marilyn Troy, Chairperson of the Clarkstown Democratic Committee, agreed to accept a resume from Sanchez. No party affiliation.[8]

In this light it is important to consider the fate of plaintiff Tabakman in comparison with the fate of Manuel Sanchez, whose name finally was submitted. Although, as noted above, Marilyn Troy, the Clarkstown Democratic Committee Chairperson, agreed to accept a resume from Sanchez, she stated that she thought it would be difficult for her to support or assist Tabakman, who had been very active in the campaign of Hon. William Wray, Jr., a Republican, for the position of County Judge. Legislator Goodfriend had expressed the same sentiments with respect to Tabakman.

Despite the pattern that is apparent in the above facts, defendant Branti has contended that he, and not the powers in the Rockland County Democratic Party, was responsible for the appointment of the Assistants, and he has contended that he had particular and non-political motivation for each of his appointments. However, having heard all the evidence and based on the full record, I conclude that no person was considered for a position as an Assistant unless his or her name was submitted in accordance with the procedure decided upon by the Democratic caucus. What defendant Branti retained was, at most, a veto power over the names of the prospective Assistants which had been submitted to him. The exercise of that veto power would not have permitted Branti to substitute the name of a person whom he had decided to appoint

---

7. The decision that no assistant attorney positions should be allocated to Haverstraw was apparently based on the fact that both the County Attorney and the Public Defender were from that town.

8. Sanchez is not registered with any political party, and he is the only non-Democrat whom defendant Branti appointed as an Assistant. In the case of the retention of Sanchez, a non-political factor was considered, namely, the fact that Sanchez speaks Spanish.

for reasons independent of political affiliation; a veto would have led to the submission of a further name or names in accordance with the procedure which the Democratic caucus had decided upon.

An examination of the selection process that was employed in arriving at the name of each of the nine 1978 appointees shows that the hiring decisions were, for all practical purposes, made by Democratic legislators or chairpersons in accordance with the procedures that had been decided upon by the Democratic caucus, and, with respect to every selection save that of Sanchez, those procedures excluded from consideration candidates who were affiliated with a party other than the Democratic Party. Moreover, the evidence shows that the only reason for which Branti sought to terminate plaintiffs as Assistants was that they were not recommended or sponsored pursuant to the procedures that had been decided upon by the Democratic caucus.

## IV.

Plaintiffs argue that defendant's attempt to exclude them from their government jobs, which jobs they had been performing satisfactorily, upon the sole ground of their political beliefs constituted a violation of the First and Fourteenth Amendments.

The leading case on the issue presented is *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In Mr. Justice Brennan's plurality opinion in *Elrod*, which opinion was joined in by Justices White and Marshall, the question presented was stated to be "whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments." *Id.* at 349, 96 S.Ct. at 2678. After an extended analysis of the facts of the case and the relevant constitutional principles, the plurality answered that question in the affirmative and concluded that plaintiffs therein had stated a cause of action.

The key to the plurality's conclusion was its holding that:

In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Id.* at 363, 96 S.Ct. at 2685 (footnote omitted). The plurality applied this test to the practice at issue in *Elrod*—a practice that involved the newly elected Cook County Sheriff's replacement of all non-civil service employees who were not members of his own Democratic party and who were not sponsored by one of its leaders. Application of the test to that practice led the plurality to conclude that the practice must be struck down as unconstitutional because none of the government interests was sufficiently compelling, in the context of "least restrictive alternative" analysis, to warrant the upholding of the practice. Thus, the plurality rejected defendant's argument that the disputed practice was necessary to insure an efficient and well-coordinated work force on the grounds that that goal could be achieved by less restrictive alternatives, namely, (1) discharge of employees for inefficiency on a case-by-case basis and (2) the use of merit systems. *Id.* at 364, 96 S.Ct. 2673. Defendant's argument that the practice was necessary to avoid the thwarting of the policies of duly elected officials was rejected on the grounds that that goal could also be achieved by a less restrictive alternative, namely, the use of the practice only in the case of employees in policy-making positions. *Id.* at 367, 96 S.Ct. 2673. Defendant's argument that the disputed practice was necessary to the preservation of the party system and hence of the democratic process was rejected on the grounds that the practice was not the least restrictive alternative whereby that goal could be obtained because there had been no showing that the destruction of the disputed patronage practices would result in the de-

struction of the party system. *Id.* at 368, 96 S.Ct. 2673. The plurality concluded that defendant had failed to meet the applicable test and that plaintiff had stated a cause of action. *Id.* at 373, 96 S.Ct. 2673.

The concurring opinion by Mr. Justice Stewart, which was joined in by Mr. Justice Blackman and which is significant because the Justices joining in it are necessary components of the Court's majority, identifies the "single substantive question" presented by *Elrod* to be "whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375, 96 S.Ct. at 2690.

It has been assumed by the parties here that the holding of the concurrence in *Elrod*

constitutes the rule of that case because, given the division of the Court, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . ." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), *quoting Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *See also Ramey v. Harber*, 431 F.Supp. 657, 662 (W.D.Va.1977) (*Elrod* read in accordance with the "least common denominator" test of *Marks v. United States* and *Gregg v. Georgia*). I conclude that plaintiffs herein must prevail even if the *Elrod* concurrence is taken to be the applicable law. However, in my judgment, *Elrod* need not be read so narrowly as the "least common denominator" test would suggest it need be.[9]

**9.** There are several reasons that support a broader reading of *Elrod* than the reading dictated by the "least common denominator" test.

First, there is the fact that three Justices joined in the plurality opinion. Given this fact, it cannot seriously be maintained that the plurality opinion is irrelevant to a determination of what is the holding of the Court. Even if it is conceded that the particular language of the concurring opinion must be taken as controlling, it is clear that the analysis and reasoning of the plurality is relevant to an elucidation of the holding of the concurring opinion. In one's effort to understand the rule of the case, it surely would not suffice to read only the concurring opinion.

Second, the particular mode of analysis employed by the plurality in *Elrod*, which analysis puts the burden of stating compelling interests on the defendant, has been employed in other cases, decided both before and after *Elrod*, in which the constitutionality of patronage practices was at issue. *See, e. g., Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir.) (politically motivated dismissal was constitutionally acceptable only if state interest is of sufficient importance to justify infringement of plaintiff's constitutional rights), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *Illinois State Employees Union, Council 34 v. Lewis*, 473 F.2d 561, 572 (7th Cir.) (Stevens, Cir. J.) (interests of state, "if strong enough," may justify imposition of conditions on public employment; burden of establishing such justification rests upon the defendant), *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1972).

Third, both the concurrence and the plurality place heavy reliance on *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570

(1973). *See Elrod*, 427 U.S. at 358–59, 360–61, 375, 96 S.Ct. 2673. The language from *Sindermann* that both the plurality and the concurrence cite is as follows:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, *there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests* —especially, his interest in freedom of speech. *For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.* This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526, [78 S.Ct. 1332, 2 L.Ed.2d 1460]. *Such interference with constitutional rights is impermissible.*
>
> \*  \*  \*  \*  \*  \*
>
> Thus, the respondent's lack of a contractual or tenure "right" to re-employment for the 1969–1970 academic year is immaterial to his free speech claim. Indeed, *twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights. Shelton v. Tucker*, [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231] *supra; Keyishian v. Board of Regents*, [385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629] *supra.* We reaffirm those holdings here.

408 U.S. at 597–98, 92 S.Ct. at 2697–2698 (emphasis added).

I turn now to an application of the holding of the *Elrod* concurrence to the instant case.

### A. Plaintiffs Were Non-policymaking, Non-confidential Government Employees

*Policymaking*

The relevant case law provides several useful principles to aid the determination of whether plaintiffs are "non-policymaking employees" in the *Elrod* sense.

Assessment of whether or not plaintiffs are "policymakers" in the relevant sense must begin with an examination of *Elrod* itself. Therein, in the plurality opinion of Mr. Justice Brennan, the following discussion of this issue occurs:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. *An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.* Thus, the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." *Illinois State Employees Union v. Lewis*, 473 F.2d at 574. Since, as we have noted, it is the government's burden to demonstrate an overriding interest in order to validate

an encroachment on protected interests, *the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent.*

*Elrod*, 427 U.S. at 367–68, 96 S.Ct. at 2687 (emphasis added). Thus in assessing whether plaintiffs herein are policymakers, it must be asked whether plaintiffs have responsibilities that are not well-defined or that are of broad scope and whether plaintiffs act as advisors or formulate plans for the implementation of broad goals. Moreover, *Elrod* counsels that, if there is any doubt about these matters, it is to be resolved in favor of plaintiffs.

The general tests enunciated in *Elrod* have been restated more recently in cases in which the issue concerned public employees' political beliefs. Thus in *Ramey v. Harber*, 431 F.Supp. 657 (W.D.Va.1977), a case very like *Elrod* in respect to its facts and its holding, the court ruled that "[f]or the purposes of the present case, the court has considered a policymaker to be one who controls or exercises a role in the decision making process as to the goals and general operating procedure of the office." *Id.* at 666 n.15. The court in *Ramey*, like the *Elrod* Court, considered the function of decision-making with respect to broad goals to be crucial to the concept of "policymaking." In this light the court in *Ramey* gave the following example: "[T]he decision to make a specific arrest would be a nonpolicymaking act while a decision to concentrate on certain types of crime would be that of a policymaker." *Id.*

Further elucidation of the concept of policymaking is to be found in *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). In that case, plaintiff had been

---

That language, which is essential to the positions of both the *Elrod* plurality and the *Elrod* concurrence, shows how broadly *Elrod* may be read. For that language, unlike the language in *Elrod* itself, suggests that the wrongful reason for discharge need not be the *sole* reason in order to render the discharge unconstitutional.

*Sindermann* leaves open the possibility that the mere fact that the wrongful reason is a substantial reason for the discharge will vitiate discharge. That the *Elrod* Court, on the facts presented to it, arrived at a narrower holding does not necessarily limit the implications of *Sindermann*.

a Deputy City Attorney and, as such, had stood in a position between the City Attorney and the Assistant City Attorneys. Plaintiff had been dismissed when, against the wishes of the City Attorney, he had announced his intention to run for Congress. 558 F.2d at 826–27. The district court, apparently using the mode of analysis employed by the *Elrod* plurality, decided that the state's interest in being able to dismiss plaintiff for political reasons outweighed plaintiff's First Amendment interests because plaintiff was a policymaker. *Id.* at 829. On appeal, the Seventh Circuit affirmed, holding, *inter alia*, that plaintiff had been a "policymaker" in the *Elrod* sense. In so holding, the Court of Appeals relied on the facts (1) that plaintiff had been given all the duties imposed by law on the City Attorney, including conducting all the law business of the city, drafting ordinances, and supervising Assistant City Attorneys; and (2) that, under the Milwaukee City Charter, plaintiff was in line to succeed the Mayor of Milwaukee if a vacancy occurred in that office. *Id.* at 829. On the basis of those facts, the Court of Appeals concluded that "plaintiff's duties were of the 'broad scope' which the *Elrod* Court equated with a policymaking function." *Id.*

Application of the principles and examples stated in *Elrod, Ramey,* and *Newcomb* to the instant case leads me to conclude that plaintiffs herein are "nonpolicymaking employees."

Although it may be true that, with respect to particular cases that they handle, plaintiffs have responsibilities that are not well-defined and are of broad scope, *see Elrod,* 427 U.S. at 367–68, 96 S.Ct. 2673, it is also true that, with respect to the overall operation of the Public Defender's Office, plaintiffs have very limited, if any, responsibility. For example, plaintiffs do not pass upon the issue of an indigent's eligibility for representation under the Federal Defender Program. Nor do plaintiffs act as advisors or formulate plans for the implementation of the broad goals of the office.

The discussion of "policymaking" in *Elrod* and the examples of "policymaking" given in *Ramey* and *Newcomb* show that the kind of responsibilities that plaintiffs have do not constitute plaintiffs policymakers. Plaintiffs make decisions in the context of specific cases; they do not make decisions about the orientation and operation of the office in which they work. Thus their decisions are more like the non-policymaking decisions "to make a specific arrest," *Ramey,* 431 F.Supp. at 666 n. 15, than they are like the policymaking "decision[s] to concentrate on certain types of crime . . . ." *Id.* Similarly, plaintiffs' duties are not of the "broad scope" of the *Newcomb* Deputy County Attorney's duties, *e. g.,* drafting ordinances, and supervising Assistant County Attorneys, which broad-scoped duties led the court to conclude that the plaintiff Deputy County Attorney was a policymaker.

*Confidentiality*

The concurring opinion in *Elrod* also requires that plaintiffs were "nonconfidential" employees. *Elrod,* 427 U.S. at 375, 96 S.Ct. 2673.

Defendant argues that plaintiffs, as Assistants, are extensions of the Public Defender with whom they serve, and that they are in a confidential relationship with both their clients and with the Public Defender himself. Although there is a scarcity of case law on the issue of what constitutes "confidentiality" in this context, I find that plaintiffs are not confidential employees in the required sense.

In *Elrod* and its progeny, the requirements of "nonpolicymaking" and "nonconfidentiality" are discussed in a manner that makes clear that the concepts are related to one another. More specifically, the discussion in the cases suggests that the concept of confidentiality is ancillary to the concept of policymaking. An employee is a "confidential employee" if he or she stands in a confidential relationship to the policymaking process, *e. g.,* as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, *e. g.,* as a private secretary to a policymaker.

In light of this relationship between the concepts of confidentiality and policymaking, I conclude that plaintiffs herein are non-confidential employees. The mere existence of the attorney-client relationship between plaintiffs and their clients does not militate against this conclusion. Nor does the existence of a "confidential" relationship between plaintiffs and the Public Defender; plaintiffs stand in a confidential relationship to the Public Defender *qua* attorney, *i. e.*, in his role of supervisor of their cases, and not *qua* policymaker, *i. e.*, in his role of decisionmaker about the orientation and operation of the office. Therefore, whatever confidential relationship may exist between plaintiffs and their clients, and between plaintiffs and the Public Defender, does not render plaintiffs "confidential employees" in the relevant sense.

### B. *Plaintiffs Were Satisfactorily Performing Their Jobs*

Application of the *Elrod* concurrence requires that, in order for plaintiffs to prevail herein, they also have been satisfactorily performing their jobs as Assistants. *Elrod*, 427 U.S. at 375, 96 S.Ct. 2673.[10]

The key consideration on this issue is the evaluation of Frank Barone, who was the Public Defender under whom both plaintiff Finkel and plaintiff Tabakman had served—Finkel for six years and Tabakman for more than two years. Barone considered both Finkel and Tabakman competent attorneys who were satisfactorily performing their duties as Assistant Public Defenders, and he would have reappointed both plaintiffs as Assistants if he had remained in the position of Public Defender.

Another consideration on the issue of competence is the assessment of defendant Branti, who had had the opportunity, in his role as Assistant District Attorney, to ob-

serve the performance of plaintiffs in their role as Assistant Public Defenders. He rated both Finkel and Tabakman as "competent attorneys." [11]

I conclude that plaintiffs have been satisfactorily performing their jobs as Assistant Public Defenders.

### C. *Plaintiffs Were Not Reappointed Solely Because of Their Political Beliefs*

The third and final requirement of the *Elrod* concurrence is that the attempt to remove plaintiffs from their jobs have been based upon the sole ground of their political beliefs. *Elrod*, 427 U.S. at 375, 96 S.Ct. 2673. I find that this requirement has been satisfied.

Defendant argues that, as to each plaintiff, there was at least one ground for nonrenewal other than political beliefs.

As to plaintiff Finkel, defendant contends that, in the fall of 1977, defendant became aware of an incident wherein Finkel allegedly betrayed the confidence of the Public Defender by forewarning the County Attorney of a litigation strategem that was to be employed by the Public Defender's Office. Whether or not defendant ever in fact actually learned of such an incident I need not now decide because I find that, even if defendant did learn of such an incident, the incident was *not* a ground for defendant's decision not to renew plaintiff Finkel. Defendant's contention about the alleged incident is merely a *post hoc* rationalization that defendant devised late in the hearing process in an effort to thwart what was apparently perceived to be plaintiffs' promising development of the case.

As to plaintiff Tabakman, defendant asserts that one ground for the decision not to renew was the existence of an ethical conflict between Tabakman and Hon. William

---

**10.** The fact that plaintiffs are removable at the will of the Public Defender is, of course, irrelevant to the determination of the constitutional issue presented herein. *E. g., Perry v. Sindermann*, 408 U.S. at 597, 92 S.Ct. 2694; *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882, 885 (1st Cir. 1976).

**11.** Testimony to this effect was given by Branti at the original hearing, and I accept it. At the second set of hearings Branti, apparently believing that the case was not going well, changed his testimony. I do not credit his later testimony, which was apparently structured to meet the perceived needs of the litigation as it developed.

Wray, Jr., Town Justice for Clarkstown, both of whom were members of the same law firm. I find that defendant never even considered this alleged conflict until after his hiring decisions had been made and the instant litigation had been commenced. In short, the possibility that Tabakman was in a position of ethical conflict was not a ground for his non-renewal.

The sole grounds for the attempted removal of plaintiffs were the facts that plaintiffs' political beliefs differed from those of the ruling Democratic majority in the County Legislature and that the Democratic majority had determined that Assistant Public Defender appointments were to be made on political bases. Under the law as announced in *Elrod*, defendant's attempt to remove plaintiffs constituted a violation of their First Amendment rights.[12]

Defendant, when he was approached by Finkel regarding the possibility of reappointment, said, in effect, that the matter was out of his hands. In short, the matter was one of party politics, and the question of the merit of any particular candidate was largely irrelevant. Faced with a similar fact situation, the court in *Ramey v. Harber* reasoned as follows:

> Moreover, defendant's response to plaintiff's queries during the interim period is most telling. *The plaintiffs were to take their questions to their defeated principal.* The implication was clear: He (Harber) had been elected through the support of his party—Flanary had been defeated and *the sorry state of affairs suffered by Flanary's employees was not to be placed at [Harber's] door.* In such circumstances, *merit, training, and experience were*

*to be extraneous considerations.* The court must find that the preponderance of the evidence, and the inferences reasonably drawn therefrom, establishes that plaintiffs were refused consideration for reappointment solely because of their political beliefs and affiliations.

*Ramey*, 431 F.Supp. at 666–67.

### V.

I find that defendant's attempt to remove plaintiffs was based solely on their political beliefs.[13] Under *Elrod* and its progeny, plaintiffs are entitled to the relief sought herein. Accordingly, the requested injunction will issue.

This memorandum constitutes my findings of facts and conclusions of law under Rule 52, Fed.R.Civ.P.

Settle judgment on notice.

---

12. It is important to note that the fact that defendant and the Democratic majority attempted to effectuate the removals at issue herein by an indirect process, with Branti acting as the agent for the Democratic majority, does not serve to distinguish this case from *Elrod*, wherein the Cook County Sheriff himself effectuated the constitutionally impermissible removals. The legal effect of the instant removals is the same as the effect in *Elrod* because it is the grounds for such removals, and not the process whereby they are carried out, that determines whether or not such removals are constitutionally permissible.

13. Perhaps not squarely presented in this action, but deeply disturbing nonetheless, is the question of the propriety of political considerations entering into the selection of attorneys to serve in the sensitive positions of Assistant Public Defenders. By what rationale can it even be suggested that it is legitimate to consider, in the selection process, the politics of one who is to represent indigent defendants accused of crime? No "compelling state interest" can be served by insisting that those who represent such defendants publicly profess to be Democrats (or Republicans).