Andrew A. FARKAS, Anthony J. Rotondi, Frank P. Enea, James S. Bailoni, Anthony J. Ciarelli, Paul H. Goodemote, Thomas A. Coco, Thomas K. Friel, John C. Hammerle, Charles L. Domson, Edward J. Sparaga, John Milliron, Harold A. Smith

v.

Richard THORNBURGH, Individually and in his capacity as Governor of Pennsylvania, Howard A. Cohen, Individually and in his capacity as Secretary of Revenue for the Commonwealth of Pennsylvania, Marilyn W. Strode, Individually and in her capacity as Chairperson of the Lancaster County Republican Committee, and the Lancaster County Republican Committee, Betty Gardner, Individually and in her capacity as Chairperson of the Lycoming County Republican Committee, and the Lycoming County Republican Committee.

Civ. A. No. 80–0241.

United States District Court,
E. D. Pennsylvania.

June 12, 1980.

Daniel H. Shertzer, Lancaster, Pa., for plaintiffs.

W. J. Taylor, Morgan, Lewis & Bockius, Philadelphia, Pa., for Governor and Secy. Revenue.

Michael Perezous, Lancaster, Pa., for Strode and Lancaster Co. Republican Committee.

Robert J. Wollet, Williamsport, Pa., for Gardner and Lycoming Republican Committee.

## MEMORANDUM

TROUTMAN, District Judge.

Orating to the United States Senate early in 1832, William Learned Marcy[1] of New York quipped "To the victors belong the spoils of the enemy!".[2] Unwittingly, he captured in this *ben trovato* apostrophe the common misunderstanding of the practice of patronage,[3] which Thomas Jefferson, a Republican,[4] first used as strategy to conciliate the then recently displaced Federalist

---

**1.** Senator Marcy (1786–1857) later served as Governor of New York (1833–1835), Secretary of War to President Polk (1845–1849) and Secretary of State to President Pierce (1853–1857).

**2.** *Gales & Seaton's Register of Debates,* (January 1832).

**3.** Actually, presidents used patronage originally to preserve equilibrium among volatile party members, to discipline mavericks and to suppress dissension. For this reason President Taylor favored appointment of radical Whigs, President Fillmore, conservative Whigs, and President Buchanan, the southern wing of the Democratic party. By 1850 patronage had become so firmly entrenched in American politics that a change in administration even without a change in party precipitated a maelstrom of dismissals and appointments. For example, President Buchanan, a Democrat, discharged large numbers of incumbent officeholders ap-

pointed by President Pierce, also a Democrat. *See generally,* A. Nevins, *Fruits of Manifest Destiny,* Vol. I of *Ordeal of the Union* (1947).

**4.** Perhaps a more appropriate party designation for Jefferson would be "Antifederalist" rather than Republican. *See* C. Beard, *Economic Origins of Jeffersonian Democracy* (1949). As one historian observed, "Federalist[s] . . . feared, above all, power lodged in the majority. Jefferson feared power lodged anywhere else." R. Hofstadter, *The American Political Tradition,* 26 (1948). In a nutshell, Federalist policy was mercantilist, nationalist and relatively aristocratic. The Republicans tempered these perspectives with laissez faire, states' rights and an interest in the welfare of the average person, respectively. *See generally* D. Malone, *Jefferson and the Rights of Man* (1951) and *Jefferson and the Ordeal of Liberty* (1962).

**1170**

party.[5] Andrew Jackson later accepted patronage as an effective measure to propitiate dissenters and consolidate factions in the still nascent and undisciplined Democratic party.[6] Abraham Lincoln, who used patronage much more extensively than either Jefferson or Jackson, found distribution of public offices an effective means to guarantee party, and therefore national, unity.[7] Although deprecated by many critics,[8] the practice of patronage thrived and survived reform measures calculated to curb its flagrant abuse during the Gilded Age[9] to become an accepted part of the

5. Jefferson wrote, "If we can hit on the true line of conduct which may conciliate the honest part of those who were called federalists, & do justice to those who have so long been excluded from [the patronage] I shall hope to be able to obliterate, or rather to unite the names of federalists & republicans . . . [and] to treat tenderly those who have been estranged from us." Letter to Horatio Gates, March 8, 1801, *The Works of Thomas Jefferson*, IX, 205–206, ed. by P. L. Ford (1905).

6. In his First Annual Message to Congress in December 1829, Jackson said:
   The duties of all public officers are, or admit of being made, so plain and simple that men of intelligence may readily qualify themselves for their performance, and I cannot believe that more is lost by the long continuance of men in office then is generally to be gained by their experience . . .
   In a country where offices are created solely for the benefit of the people no one man has any more intrinsic right to official station than another."
   1 *State of the Union Messages to Congress 300*, ed. by F. Israel (1966). However apothegmatically incorrect Jackson may have been about "rotation in office" (his euphemism for patronage), Jackson rationalized the practice as an agency of democracy. That is, patronage democratized the federal service by rendering it more representative of the national citizenry and by removing aristocrats from federally appointed posts which had become epicurean sinecures. Although some historians trumpet Jackson's pervasive endorsement and exploitation of patronage, actually Jackson removed no more than one-tenth to one-fifth of the previously appointed federal service. Later presidents, notably Taylor and Lincoln, used it much more extensively. *See* M. Tolchin, *To the Victors* (1971) and A. Nevins, *Fruits of Manifest Destiny, supra.*

7. In fact, Lincoln wrote that "[a]s to the use of patronage . . . I intend in that matter to accommodate the people in the several localities". Letter to John A. Gilmer, *The Collected Works of Abraham Lincoln*, ed. by R. Basler (1953), IV, 151.

8. Antagonists of the practice included Horace Greeley, editor of the *New York Tribune*, William Cullen Bryant, journalist and poet, and John Stuart Mill, who considered patronage the primary defect of the American system of

government. *See* V. Parrington, *The Romantic Movement*, Vol. 2 of *Maincurrents in American Thought* (1927). Many presidents decried the burden imposed by irrepressible and voracious office seekers who haunted the White House. President Lincoln complained that they "provoke[d] my friends and harass[ed] me"; he lamented how jobs were "*fiercely* sought by, and for, others". Letters to Edward L. Baker, June 15, 1863, and Robert Irwin, March 20, 1861, *The Collected Works of Abraham Lincoln*, ed. by R. Basler (1953), VI, 275, and IV, 296, respectively.

President Cleveland loathed the "d___d everlasting clatter for offices [which] continues to some extent, and makes me feel like resigning, and HELL is to pay generally." Letter to Wilson S. Bissell, November 25, 1885, *Letters of Grover Cleveland*, ed. by A. Nevins (1933).

Interestingly, while acting as Secretary of State during the Jefferson administration, James Madison observed that "[t]he task of removing, and appointing, officers continues to embarrass . . . and to agitate . . . The degree, the mode and the times of performing it are quite rendered the more perplexing by the discord of information and counsel received from persons whose principles and views are the same." Letter to Wilson Cary Nicholas, July 10, 1801, *Writings of James Madison*, VI, 425, ed. by G. Hunt (1906).

9. During the decades following Reconstruction, patronage, not issues, divided parties and distinguished one from the other. *See* R. Hofstadter, *The American Political Tradition* (1948). In the long run rampant abuse and in the short run the assassination of President Garfield in 1881 by a disappointed office seeker prompted Congress to pass the first civil service reform legislation, the Pendleton Act, Act of January 16, 1883, c. 27, 22 Stat. 403, which, however, had only limited application and dealt mostly with entry into federal service and not tenure, promotion and removal. The Act did proscribe removal of an employee for failure to contribute to political funds or to render political services. In 1897 President McKinley promulgated Civil Service Rule II, § 8 of which provided that federal employees could not be removed "except for just cause". The Lloyd-LaFollette Act, passed in 1913 and now codified at 5 U.S.C. § 7501 et seq., expanded this rule to prohibit removal "except for such cause as will promote the efficiency of said service". *Cf.* 5 U.S.C.

American political process.[10] However, recently reviewing the constitutionality of the practice, the Supreme Court of the United States concluded that in certain circumstances patronage offended the First Amendment aegis of political expression and association.[11] Expressing this notion in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and more recently in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court held generally that employees may not be discharged *solely* for political reasons.

Plaintiffs,[12] thirteen district administrators for the Department of Revenue of the Commonwealth of Pennsylvania, instituted this action January 17, 1980, seeking injunctive relief against the Governor of Pennsylvania and the Secretary of Revenue.[13] Initially, plaintiffs requested a temporary restraining order enjoining defendants from terminating employment of several plaintiffs who had not been removed from office and to require reinstatement of plaintiffs who already had been discharged. The parties agreed that a prompt hearing sur plaintiffs' motion for a preliminary injunction would obviate the need for more immediate relief, whereupon the Court scheduled the

hearing for January 30, 1980. The Court denied the motion for a preliminary injunction upon finding that plaintiffs failed to demonstrate either a "reasonable probability of eventual success on the merits", *Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356–57 (3d Cir. 1980), or irreparable injury. *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917 (3d Cir. 1974). *Cf. Punnett v. Carter,* 621 F.2d 578, 583 (3d Cir. 1980) (plaintiffs failed to show "any likelihood that they would prevail on the merits"). The Court also weighed harm to the non-moving party and the public generally if the injunction issued. *Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589 (3d Cir. 1979).[14] Thereafter, the Court set March 3, 1980, as the date for the hearing sur plaintiffs' motion for a permanent injunction. At plaintiffs' request the Court continued the matter until March 10, 1980, then until April 8, 1980, and again until April 21, 1980, to allow plaintiffs to complete discovery which they represented to the Court as indispensable to their case. Finally, on April 23, 1980, the parties proceeded to the merits before the Court sit-

§§ 7503 and 7513 (federal civil service employee may be dismissed or suspended "only for such cause as will promote the efficiency of the service") and the Statement of Purpose of the Civil Service Reform Act of 1978 ("the merit system principles . . . shall govern"), 1978 U.S.Code Cong. & Admin.News, pp. 2739–40. This Act is the most comprehensive approach taken toward civil service reform since Congress enacted the Pendleton Act.

**10.** *See generally History of United States Political Parties,* ed. by A. Schlesinger, Jr. (1973).

**11.** The parameters of the First Amendment include the "freedom to associate with others for the common advancement of political beliefs and ideas . . . The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom". *Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). *See also Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 57 L.Ed.2d 830 (1973) and *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

**12.** Plaintiffs and their respective districts were Andrew Farkas (Lancaster), Anthony Rotondi (Williamsport), Frank Enea (Bethlehem), James Bailoni (Sunbury), Anthony Chiarelli (Reading) (still retained temporarily), Paul Goodemote (York), Thomas Coco (Scranton), Thomas Friel (Bradford), John Hammerle (Indiana), Charles Domson (Pottsville), John Milliron (Altoona) (now deceased), Harold Smith (Washington) (still retained temporarily), and Edward Sparaga (Erie). A third district administrator still temporarily retained by the Department of Revenue, William Steeley (Doylestown), did not sue.

**13.** Originally plaintiffs also named as defendants the Republican Committees of Lancaster and Lycoming Counties and their respective chairmen. However, during the preliminary injunction hearing plaintiffs agreed to dismiss the request for injunctive relief only as to them. Plaintiffs based jurisdiction on 28 U.S.C. §§ 1343(3) and (4).

**14.** An appeal of this order is currently pending with the United States Court of Appeals for the Third Circuit.

ting without a jury.[15] Notwithstanding the intervening discovery, plaintiffs offered no additional testimony and relied exclusively upon numerous documents which they moved into evidence. Defendants called only the Secretary of Revenue to testify and thereafter rested. The matter is pres-ently before the Court for findings of fact and conclusions of law, which follow.

■ To prevail in an action under *Elrod v. Burns* and *Branti v. Finkel, supra,* plaintiffs must show that the Secretary discharged them solely for the reason that they were not affiliated with the Republi-

---

**15.** Fed.R.Civ.P. 39(a)(2) provides that [w]hen trial by jury has been demanded . . the trial of all issues so demanded shall be by jury, unless the court upon motion or of its own initiative finds that a right of trial by jury *of some* or all of those issues does not exist under the Constitution or statutes of the United States. (emphasis added)

Plaintiffs requested injunctive relief, originally a temporary restraining order and later a preliminary and permanent injunction, which, they concede, does not afford them a right to trial by jury. *See Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). However, plaintiffs' demand for compensatory and actual damages does not confer a right to a jury trial where plaintiffs collectively presented only one cause of action which they predicated on an allegedly unconstitutional dismissal from public office. Therefore, the Court could not separate various legal and equitable claims as courts did in numerous cases cited by plaintiff to allow jury determinations thereof. For example, in *National Union Electric Corp. v. Wilson,* 434 F.2d 986 (6th Cir. 1970), plaintiff alleged seven causes of action, including a conspiracy to defraud, to compete unfairly and to appropriate trade secrets. Additionally, plaintiff claimed false representations on the part of some defendants, illegal withholding of salaries and other wanton and wilful conduct by defendants. Plaintiff also sought injunctive relief. The Court of Appeals held that the trial court should have submitted the legal issues to a jury and retained "any equitable issues, *including injunctions* " for decision by the court. *Id.* at 988. *See also Plechner v. Widener College, Inc.,* 569 F.2d 1250, 1258 (3d Cir. 1977) ("if a claimant can be made whole only by specific relief available in equity, there is no right to a jury . . . That is the situation here and therefore no right to a jury trial has been established".)

That resolution of plaintiffs' request for injunctive relief, admittedly a pure question of equity for the Court to decide, would require determinations of fact which would later bind plaintiffs when they presented the question of damages to the jury is the result of plaintiffs' decision relating to the proper approach and direction in prosecuting their claims. Thus, plaintiffs' reliance on *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) and cases like *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) cannot withstand scrutiny. These circumstances involved "a joinder of several claims, some legal, some equitable, and not a situation like the one presently before us in which a single cause of action must be characterized itself as legal or equitable". *Slack v. Havens,* 522 F.2d 1091 n. 4 (9th Cir. 1975).

Moreover, plaintiffs did not lose their right to a trial by jury on the legal issues, for had plaintiffs succeeded in obtaining a permanent injunction the Court could, and indeed probably would, have convened a jury to award damages. *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 122 (5th Cir. 1973) ("so long as a party is granted a jury trial on issues properly triable by jury it may not complain that equitable issues were disposed of by the trial court".).

Merely requesting monetary award as an incident of the relief demanded does not automatically mandate that the action be characterized as legal rather than equitable, *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and including a request for backpay with reinstatement will not metamorphosize the equitable nature of plaintiffs' claim. Computation of backpay is a relatively simple and undisputed matter of arithmetic which does not *require* the consideration of a jury.

The ultimate analysis to determine whether plaintiff has a right to jury trial includes consideration of whether the remedy is legal or equitable and whether the issue is triable to a jury given their practical abilities and limitations. *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Undoubtedly injunctive relief is equitable in nature. Whether a jury could have functioned knowledgably and effectively under these circumstances is open to question. Where a practice like patronage, historically considered legal and proper, is recently reevaluated and determined to be constitutionally flawed in some but not all circumstances and where a decision of the Supreme Court of the United States alters the legal standard to be applied to the facts during the course of the proceedings, jury (if not judicial) confusion is inevitable. The announcement of the *Branti* decision eight days prior to the originally scheduled hearing for the permanent injunction and receipt of the opinion in this office several days later contributed little to the expeditious and facile resolution of the issues.

With all these considerations in mind the Court denied plaintiffs' motion for a trial by jury.

can party. *Branti v. Finkel,* 445 U.S. at 517, 100 S.Ct. at 1294, *Elrod v. Burns,* 427 U.S. at 350, 96 S.Ct. at 2678. However, if political affiliation would interfere with the efficacious performance of their public duties, employees may be dismissed on this basis with impunity. *Branti v. Finkel,* 445 U.S. at 517, 100 S.Ct. at 1294, *Elrod v. Burns,* 427 U.S. at 366, 96 S.Ct. at 2686. Defendants conceded that party affiliation was not a necessary prerequisite to the effective discharge of the duties assigned to district administrators. *See Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1295. Therefore, the relevant inquiry requires determination of whether defendants discharged plaintiffs *solely* because of their affiliation with the Democratic party or whether defendants "lack[ed] confidence" in the dismissed district administrators whom they "inherited" from the prior administration and "for some reasons other than political affiliations" terminated their employment. *Branti v. Finkel,* 445 U.S. at 520 n. 14, 100 S.Ct. at 1295 n. 14. *Cf. Elrod v. Burns,* 427 U.S. at 366, 96 S.Ct. at

2686 ("employees may always be discharged for good cause, such as insubordination or poor performance, if those bases in fact exist"). In other words, if a legitimate apolitical motivation prompted plaintiffs' dismissals, defendants were at liberty to discharge them.

■ To demonstrate political motivation in the case at bar, plaintiffs relied upon statistical information which indicated that the Secretary hired seventeen Republicans and retained or hired a total of only twelve Democrats to fill the thirty-two vacancies for the district administrator position.[16] True, motivation may be proven by adducing statistical information, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[17] but the statistics provided by plaintiffs do not establish discharge *solely* because of political affiliation. If these statistics prove any fact, they demonstrate that the Secretary did indeed disregard political persuasion and instead relied upon candidates' merits and qualifications.

**16.** Under previous administrations each field office had separate supervisors for the collection of different taxes. Following functionalization, one district administrator in each office assumed responsibility for collecting all taxes. However, in Philadelphia and Allegheny Counties the unique demographic situations required variation. In these two counties each tax collected within the district has a separate supervisor. After the present Secretary reduced the number of field manager positions, only twenty-four vacancies for district administrators remained to be filled. The Philadelphia and Allegheny offices account for the eight additional vacancies. Notwithstanding that none of the plaintiffs held jobs in the Philadelphia or Pittsburgh offices, the Secretary's motive in filling these positions could hardly be more relevant to the instant issue of whether he discharged plaintiffs solely for political reasons.

The Secretary hired fourteen Republicans to vacancies created by dismissal of Democratic incumbents and two Republicans to vacancies created by resignation of Democratic incumbents. The prior group included Patrick Foley (Bradford), Julia May (York), Bruce Kegerize (Lancaster), Richard Edwards (Williamsport), Elizabeth Hoffman (Bethlehem), Ted Alleman (Altoona), Anthony Murray (Philadelphia), Murray Dolfman (Philadelphia Inheritance Tax), Jonathan Saidel (Philadelphia Sales Tax), Mark Lucero (Erie), Bruce Harbaugh (Scranton), Bernard Garred (Indiana), Leona Hochger-

tel (Pottsville) and Hugh Jones (Sunbury). The latter group included Florence Hunt (Media) and John Newett (Norristown).

The Secretary hired one democrat, Joseph Latch (Johnstown), to replace an incumbent who resigned.

The Secretary hired one Republican, Harry Walker (Pittsburgh) (whom he promoted from Head of Cigarette Taxes) and retained eleven Democrats: Gerald Doyle (Wilkes-Barre), Morris Boiman (Philadelphia), Ernest Wisyanski (Greensburg), Vincent Turriziani (New Castle), William Sherry (Oil City-Sharon) (who changed his registration in April 1979 to Republican), Frank Capozzi (Pittsburgh Sales Tax) (who changed his registration in August 1979 to Republican), Robert Johnson (Pittsburgh Personal Income Tax) (who changed his registration in March 1979 to Republican), Morris Santicola (Pittsburgh Inheritance Tax), Jack Minahan (Pittsburgh Income Tax), Edward Swoyer (Philadelphia Personal Income Tax), and Knovel Lamberti (Harrisburg). The status of three Democratic district administrators temporarily retained has not been determined. See n.12.

**17.** *See also New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) and *Martin v. Easton Publishing Co.,* 85 F.R.D. 312 (E.D.Pa.1980).

■ Plaintiffs also pointed to several other facts, such as prior active participation in local Republican politics by several appointees. The Secretary responded to a question relating to this matter:

Q. Well, it is true, isn't it, that some of the replacements were active in politics?

A. It is also true . . . that while they are in the Department of Revenue, they are not . . . That is not exactly what the new Department of Revenue is about.

Plaintiffs also emphasized the fact that one appointee's uncle presently serves as a state senator. The Secretary testified that he did not know of this family connection. None of these items, alone or in concert, demonstrate that the Secretary fired plaintiffs for political reasons only. Moreover, even assuming that in the particular circumstances described above the Secretary harbored a politically spawned animus toward some replaced plaintiffs, where the primary impetus for removal lacked impermissible motivation a possibly illegitimate motive incident thereto will not vitiate otherwise legal conduct. A political firing violates the interdictions of the First Amendment only when the employing authority dismisses an employee "*solely* for political reasons." *Branti v. Finkel,* —— U.S. at ——, 100 S.Ct. at 1301, *Elrod v. Burns,* 427 U.S. at 350, 96 S.Ct. at 2678.[18] In other words, an independent justification coupled with a constitutionally flawed reason will not taint the Secretary's decision to terminate plaintiffs' employment. *See Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[19]

18. *Cf. Garza v. Rodriguez,* 559 F.2d 259 (5th Cir. 1977), *cert. denied,* 439 U.S. 877, 99 S.Ct. 215, 58 L.Ed.2d 191 (1978), in which the court held that a constitutionally impermissible reason (retaliation for plaintiff's threat to sue) linked with a constitutionally legitimate one (disciplinary action stemming from plaintiff's obscene behavior and speech) did not affect the legality of plaintiff's discharge.

19. In *Mt. Healthy* the school board refused to tenure a teacher for several reasons, which included a constitutionally impermissible one (plaintiff divulged the contents of an interfaculty memorandum to a local radio station) and a constitutionally legitimate one (plaintiff had used obscene language and gestures in dealing with students and school staff). The court held that once the employee had shown that constitutionally *protected conduct* played a "substantial role" in the employer's decision to fire him, the employer was entitled to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. *See also Givhan v. Western Line,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) and compare with *East Texas Motor Freight Systems, Inc. v. Rodriguez,* 431 U.S. 395, 403 n.9, 97 S.Ct. 1891, 1897 n.9, 52 L.Ed.2d 453 (1977) ("[e]ven assuming, arguendo, that the company's failure even to consider the application was discriminatory, the company was entitled to prove at trial that the respondents had not been injured and they were not qualified and would not have been hired in any event"), *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 369 n. 53, 97 S.Ct. 1843, 1872 n. 53, 52 L.Ed.2d 396 (1977) ("the burden will be on the employer to show that the no-napplicant was nevertheless not a victim of discrimination . . . the employer might want to show that there were other, more qualified persons who would have been chosen . . or that the nonapplicant's stated qualifications were insufficient"), *Village of Arlington Heights v. Metropolitan Development Corp.,* 429 U.S. 252, 270–71 n.21, 97 S.Ct. 555, 566 n.21, 50 L.Ed.2d 450 (1977) ("[p]roof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered . . . .. In such circumstances, there would be no justification for judicial interference with the challenged decision.")

Although the Supreme Court decided *Mt. Healthy* within the First Amendment context of freedom of speech, the constitutional principle at stake in the case at bar, freedom of political association, is essentially the same in that both freedoms involve the right to pursue one's constitutional rights free from governmental intervention or retaliation. *Cf. East Texas Motor Freight Systems, Inc. v. Rodriguez, supra* (context of 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1983), *International Brotherhood of Teamsters v. United States, supra,* (context of 42 U.S.C. § 2000e *et seq.*), *Village of Arlington Heights v. Metropolitan Development Corp., supra* (42 U.S.C. § 3601). Even assuming plaintiffs have adequately proven that their membership in the Democratic party played a

Therefore, again assuming that political motives inspired plaintiffs' dismissal, the situation would remain dramatically different from the firings adjudicated in and proscribed by *Elrod v. Burns* and *Branti v. Finkel, supra.* In *Elrod* a newly elected Democratic sheriff discharged numerous non-civil service employees within the department because they lacked or failed to obtain affiliation with or sponsorship by the Democratic party. Defendants made no attempt to justify their actions on the basis of merit selection of replacements. In *Branti* a newly appointed Democratic public defender terminated employment of the Republican assistants remaining from the prior administration because they had not been recommended or sponsored pursuant to prevailing Democratic party procedures. The trial court found the party organization and its carefully prescribed procedures dictated the array of candidates from which the new public defender could select his assistants and, therefore, concluded that no non-discriminatory justification existed. *Finkel v. Branti,* 457 F.Supp. 1284 (S.D.N.Y. 1978). In sharp contrast, in the case at bar the Secretary exercised unfettered discretion in attracting recruits for appointments as district administrators. In fact, the procedure he employed in replacing some of the prior district administrators, including, for example, solicitation of recommendations from a broad spectrum of sources and use of uniform evaluations forms for all interviewed candidates, suggests that the Secretary acted in accordance with his articulated diligence and sincerity in recruiting and hiring competent and responsible individuals for the position of district administrator.

In addition, the factual background of his actions amply indicate the apolitical nature of his conduct and motives. Appointed to his position in February 1979, the Secretary immediately evaluated the operation of the Department of Revenue and concluded that both a reduction in managerial positions and an upgrade in the qualifications for the office of district administrator would enhance efficiency within the department. In accordance with this goal, the Secretary announced a reorganization of the departmental field offices. The Secretary abolished fifty-one of eighty-three managerial field positions, leaving thirty-two to be filled. Eliminating these many opportunities to dispense political favors hardly comports with plaintiffs' characterization of the Secretary as a proponent of strictly partisan politics.

Because district administrators, the highest ranking Revenue Department field officials, interpret and enforce tax laws, advise the Secretary on matters relating to tax policy, develop and install implementing and resource allocation policies for the district offices, recommend hiring and firing of subordinates and legal actions against taxpayers, allocate work forces to emphasize particular tax problems within the district, organize and direct tax programs, and advise taxpayers, the Secretary established several minimum requirements for the job. To be considered for employment, a candidate was required to have three years' experience in office management and a bachelor's degree or an equivalent combination in experience and training. Other desiderata included an "ability to plan, organize and direct the work of others", an "ability to exercise judgment and discretion in applying and interpreting departmental policies and procedures" and an "ability to develop, install and evaluate policies and procedures". In two words, the Secretary's, the salient characteristics of a district administrator he intended to employ were "integrity" and "quality".[20]

"substantial role" in the Secretary's decision to fire them, the Secretary has clearly demonstrated by a preponderance of the evidence that he would have reached the same decision even if plaintiffs had been Republicans. The Secretary's avowed and proven legitimate and non-discriminatory reason—plaintiffs' lack of qualification to fill the position under the reorga-

nized department—justifies his conduct. *See infra* at 1177–1178.

20. At trial the Secretary further refined the attributes of desired district administrators. The Secretary wanted individuals with "integrity and honesty, simply because they are in a position to handle . . . large sums of pub-

Meanwhile, the Secretary advised the incumbent district administrators that he would retain them temporarily pending "an intensive effort to recruit and select the best qualified personnel" for all of the vacant positions. The Secretary further informed incumbents that he would solicit applications from the general public as well as from them in order to ensure that the most qualified people would be considered. After soliciting applications and recommendations from numerous organizations such as the AFL-CIO, Dickinson School of Law, NAACP, the Urban League, bar associations, accounting groups, colleges of business and public administration, and every Representative and Senator in the General Assembly of the Commonwealth of Pennsylvania, the Secretary and his staff interviewed approximately two hundred persons.[21] This endeavor resulted in the reappointment of eleven incumbent Democratic district administrators and the selection of a Democrat to replace a prior administrator who resigned. Several Democratic district administrators whom the Secretary appointed later changed registrations,[22] and another Democrat whom the Secretary selected initially accepted but later declined an appointment. The Secretary testified that he made no inquiry into candidates' political affiliation and that membership in the Republican party was not a prerequisite to appointment. *See Tanner v. McCall,* 441 F.Supp. 503 (M.D.Fla.1977). In fact, the Secretary appointed or retained persons with outstanding qualifications. For example, the Secretary appointed as district ad-

lic monies". The Secretary looked for candidates who had a "capacity to plan, to organize, to direct people, to interface or relate not only to their own employees in the field force, but also in particular to members of the general public, especially the tax bar and accountants"; who could "staff and recruit as vacancies might occur"; who would have the capacity to relate to the high pressure situations of elected public officials, who are constantly asking the people in their own areas . . . for advice and counsel on various pieces of legislation"; who would "come up with original ideas as to how to better manage, as to how to recommend improvements in the tax law"; who could "perform the traditional control of budget and utilization resource questions"; who could "reclaim and rebuild the reputation of the Department of Revenue".

**21.** The testimony of the Secretary described the process in detail:

Q. . . . I want to know how you went through the process and how you reached the decision to man the offices during that period.

A. Actually, it was a part of a continuing and iterative process in the sense that when we were deciding whether, or examining the question of whether we could successfully reduce the number of managers in the field offices, which would have been consistent with the Governor's priorities to bring more economic and efficient government to Pennsylvania, and certainly consistent with my own priorities to run as lean and as well managed a department as was humanly possible, we examined not only the functions of the various management slots actually being performed, but we also reviewed the various persons filling those positions.

Q. Now, would you tell us what . . . you have described as a four-step process in making those permanent decisions.

A. . . . [W]hat I fundamentally did, and I think which is a fairly classic approach in management with respect to either large scale public or private non-private enterprises, including government, was first [to] assemble a team to provide an analysis and a review of the jobs, its functions, what actually took place . . .

Q. Then step two, now?

A. Step two was a review of all those who had been there and had applied and a review of any recommendations that might have been made; in a sense, a paper cut.

The third level of the review was the actual interviewing process . . . .. And the fourth piece was the actual selection process . . . in which I always took part . . and reviewed all the papers . . . the interviews . . . and [decided] who was the best qualified person from an available pool of applicants . . . .. [The district administrator position] is very much a policy job in that it reflects . . . the attributes of true policymaking positions, which are primarily the continuous and difficult exercise of judgment, discretion. It ranges from giving me advice and counsel on a confidential basis with respect to either newly pending legislation, already existing legislation, regulations we seek to administer.

**22.** Despite these plaintiffs' formal and unsolicited change in registration shortly after the Secretary took office, we treat them as Democrats. *See Branti v. Finkel,* 445 U.S. at 516, 100 S.Ct. at 1293 and note 16 above.

ministrator in Philadelphia a graduate of St. Joseph's Preparatory College, Pennsylvania Maritime Academy, St. Joseph's College and Temple University School of Law. In addition to degrees in business administration and law, this new appointee was a licensed professional city planner in New Jersey and a licensed real estate broker in Pennsylvania. Prior to six years of private practice in law, he was vice president of a community development corporation and coordinated land use research. Earlier he served as executive vice president and general counsel to a consulting firm which specialized in city planning, urban design, real estate, urban renewal and public administration. This new administrator also was a rear admiral in the United States Naval Reserve.

In the same office the Secretary also appointed another Philadelphia attorney who acted as Special Attorney General for the Commonwealth of Pennsylvania in the Inheritance Tax Unit in Philadelphia from 1963 until 1971. A graduate of the University of Pennsylvania with a Bachelor of Science degree in economics and the Temple University School of Law with a Juris Doctor degree, this particular appointee has lectured on law, including insurance and business law, at the Wharton School of Business, University of Pennsylvania, since 1964. Other appointees-retainees studied at or obtained degrees from Columbia University, St. John's University, Cornell University, Temple University, Duquesne University, the University of Delaware and the University of Pennsylvania. Several had graduate degrees; one was a doctoral candidate at the Pennsylvania State University. Prior work experience included a Register of Deeds from Chester County, an appraiser in the real estate division of the Crawford County Assessors Office (and formerly a chief appraiser with the Pennsylvania Department of Revenue's inheritance tax division), an attorney who spent nearly thirty years with the Federal Bureau of Investigation and whom his supervisor described as a "very astute and intelligent administrator", an industrial development coordinator for McKean County (who previously had been an operations officer for the McKean County Housing Authority and assistant chief clerk to the McKean County commissioners), the Chief Clerk of the Northumberland County Commissioners, a former tax consultant and field investigator for the Pennsylvania Department of Revenue (Bureau of Taxes for Education), the Clerk of Court in Montgomery County (previously an appraiser with the Pennsylvania Department of Revenue), a financial analyst who had previously been director of personal property taxes in Erie County, a claims adjuster for the State Workmen's Insurance Fund, an executive director of the Area Transportation Authority of Northcentral Pennsylvania (and a retired Lieutenant Colonel in the United States Army), a tax collector in Schuylkill County, an accountant with over ten years' experience, a deputy district collector with the Internal Revenue service, and an adjunct professor of tax at Temple University's accounting department.

Several new appointees had extensive experience within the department. For example, the district administrator in the Harrisburg office served as Acting District Administrator in the Department of Revenue's Bureau of Field Operations (1978–1979), worked in the assignment unit of the investigation division (1978), and served as field chief in the Personal Income Tax Bureau (1976–1978), chief of Audit and Compliance Division in the Personal Income Tax Bureau (1972–1974), chairman of the Sales Tax Board of Review, Bureau of Sales and Use Tax (1961–1972), hearing examiner, Sales Tax Board of Review (1959–1961), and as an accountant with the Bureau of Sales and Use Tax, Hotel Occupancy Division (1957–1959).

In contrast, district administrators whom the Secretary did not retain often did not have a college degree; some had only high school training. A few started additional education but did not graduate. Prior work experience typically included jobs as plant managers or production supervisors. Many had received from the personnel director of the department notice which expressed "considerable disappointment" with their

performances. The director questioned "just how intensely and meaningfully" each one had been involved in the administration of his district office. Performance evaluation reports often indicated that their work had been of "average quality and consistency". One district administrator whom the Secretary did not retain listed as a reference a state senator, who responded to the Secretary's inquiry with "a singularly unimpressive, non-supportive recommendation" of the particular district administrator. He had, as the Secretary phrased it, "good reason to be modest". The Secretary further commented that "poor" and "sloppy" management, lack of leadership, low employee morale and lack of "astute awareness of the taxation laws and regulations" implemented by district administrators characterized the stewardship of many district administrators whom he did not retain. And at least two incumbents he refused to rehire had histories of previously unsatisfactory employment demonstrating a lack of "ambition and proper attitude toward doing [their] share of work".

Worse, several had been implicated in criminal mischief or accused of malfeasance in office. In one case, the Pennsylvania Department of Justice filed charges against a district administrator whom the Secretary discharged for making false entries on the register of the Personal Income Tax Bureau. Eventually, the administrator in question entered an Accelerated Rehabilitation Disposition program with the imprimatur of the local District Attorney and Court of Common Pleas. In another instance, the Federal Bureau of Investigation and the internal investigating unit of the Department of Revenue investigated a number of people in the office of one district for criminal conduct relating to burying records of sales tax duly owed the Commonwealth. Although to date the investigation has not been completed, the Secretary indicated that mismanagement, if not criminal misconduct, pervaded the operation of the office. The Secretary also expressed a particularly strong interest in correcting apparent abuses within the Philadelphia office, which he said had the "most notorious" reputation with a "very sordid and bleak history, both with respect to raw competence and . . . allegations of, if not political corruption, something bordering very close thereto".

Clearly, the Secretary replaced district administrators whose personal and professional records indicated substandard performances with optimally qualified individuals with demonstrated competence and ability. Notwithstanding extended discovery over a period of months, plaintiffs have offered no credible evidence to support their allegations that the Secretary discharged them because they were registered Democrats. In fact, defendants have amply proven that the Secretary removed plaintiffs because he understandably and properly "lacked confidence" in their ability and competence. See Branti v. Finkel, 445 U.S. at 520, n.14, 100 S.Ct. at 1295. Accordingly, the Court finds and concludes that plaintiffs have failed to show by a preponderance of the evidence under Branti v. Finkel that defendants discharged them solely because of their political affiliation. Were Elrod v. Burns the appropriate standard, a contention not raised by the parties, a similar conclusion would be warranted.[23]

---

**23.** As noted above, the Supreme Court rendered its decision in Branti v. Finkel, supra, on March 31, 1980, ten weeks after plaintiffs filed this action, six weeks after the hearing on the preliminary injunction and three prior to the hearing on the permanent injunction. Although the parties did not raise the issue, possibly Elrod, not Branti, would control disposition of this matter. Courts have unanimously agreed that Elrod itself should be applied prospectively only. Ramey v. Harber, 589 F.2d 753 (4th Cir. 1978), cert. denied, 442 U.S. 910, 99 U.S. 2823, 61 L.Ed.2d 275 (1979), Marino v. Bowers, 483 F.Supp. 765 (E.D.Pa.1980), Raggio v. Matunis, 489 F.Supp. 16 (E.D.Pa.1979), Litwhiler v. Hedlay, 429 F.Supp. 984 (M.D.Pa. 1977).

The appropriate test governing the determination to apply a decision retroactively requires that

the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . Hanover Shoe v. United Shoe Machinery Corp., [392 U.S. 481], at 496 [88 S.Ct. 2224 at 2233, 20

Judgment will be entered in favor of defendants and against plaintiffs.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

## APPENDIX

Plaintiff Farkas testified as follows:

Q. [Y]ou did, in fact, establish daily procedures, didn't you?

A. Yes, to the guidelines as set down by my administrators in Harrisburg.

Q. [Y]ou were responsible for the level of efficiency in your district, weren't you?

A. Yes, sir. We all were.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. [Y]ou had to employ your discretion from time to time in deciding how to handle any given case?

A. Yes, sir

&ast; &ast; &ast; &ast; &ast; &ast;

Q. You had some discretion in making assignments of the men in your staff to their jobs?

A. Yes, sir.

Q. [Y]ou as the district administrator used your discretion in carrying out

---

L.Ed.2d 1231] or by deciding an issue of first impression whose resolution was not clearly foreshadowed, . . . *Allen v. State Board of Elections* [393 U.S. 544] at 572 [89 S.Ct. 817 at 835, 22 L.Ed.2d 1] . . .. [I]t has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation". *Linkletter v. Walker* [381 U.S. 618] at 629 [85 S.Ct. 1731 at 1738, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma* [395 U.S. 701] at 706 [89 S.Ct. 1897 at 1900, 23 L.Ed.2d 647].

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). Although *Branti* did not expressly overrule *Elrod*, *Branti* certainly made unconstitutional dismissals which would have passed muster under *Elrod*. For example, under *Elrod* an employee whom the court found to be confidential or policymaking could have been discharged simply because of his political affiliation. Under *Branti* the court shifted its focus drastically and announced that "the ultimate inquiry is *not* whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295 (emphasis added). The "clear past precedent" of *Elrod* certainly did not survive *Branti pro tanto*.

Turning to the second aspect, the purpose of *Elrod* was to preserve and protect an employee's First Amendment freedom of political association. Given the short history of the *Elrod* rule and the improbability of enhancing its purpose by retroactive application, little justification suggests a contrary result. As Mr. Justice Cardozo wrote,

the apportionment of the relative value of certainty on the one side and justice on the other, of adherence to logic and advancement of utility, involves an appraisement of the social interests which each is capable of promoting.

B. Cardozo, *Growth of the Law* (1933). To conclude that *Branti* would vitiate any discharge legally accomplished under *Elrod* surely would undermine the certainty which generally attaches to promulgations of the Supreme Court and would invite disrespect for its rulings. Utility, logic and justice join forces to require the conclusion that imposition of retroactive application of *Branti* would create the inequity and demerits which the *Chevron* test anticipated.

The Secretary's discharge of plaintiffs clearly would have been legal under *Elrod*, for testimony at both hearings indicated that they were "policymakers" within the meaning of *Elrod* and its progeny. To determine whether a particular position could be considered confidential or policymaking, courts looked to the nature of the accompanying responsibilities, *Elrod v. Burns*, 427 U.S. at 367, 96 S.Ct. at 2686–2687, decisions to be made, *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir. 1979), and the amount and scope of discretion in performing duties and making decisions. *Elrod v. Burns*, 427 U.S. at 367–68, 96 S.Ct. at 2686–2687, *Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978). The testimony of plaintiffs themselves clearly showed that they exercised broad discretion in the collection of taxes and enforcement of tax laws. By their own admission they were policymakers. (See the appendix where excerpts of their testimony have been collected).

Thus, were we to hold that *Branti* is not retroactive *Elrod* would control and we would reach the same result.

your duties and decided that in order to successfully accomplish the guidelines, that you would assign your men geographically?

A. Yes, sir.

Q. Isn't it true, Mr. Farkas, that whether or not to send someone to the field to a state fair was the individual decision of the district administrator?

A. Yes, it was.

Q. You did in your management capacity negotiate hiring, firing and retirement for some of your employees?

A. Retirement, no.

Q. Now, is this application you have described for the Department of Revenue under oath what you considered to be your duties and accomplishment in your work, is that correct?

A. Yes, sir. . . .

Plaintiff then admitted that he was "instrumental" in negotiating early retirement of "non-productive" employees and initiated the transfer of two field investigators to another district. The Secretary also offered a description of the district administrator job, the duties of which included "developing and implementing management methodologies and policies that best ensure efficient work flow while monitoring effective utilization of labor within contractual guidelines".

Plaintiff Rotondi testified as follows:

Q. Now, Mr. Rotondi, that is quite different from what you told the judge yesterday, isn't it?
You told him you had nothing to do with establishing policy . . .

A. We established policies within the guidelines that are set forth.

Q. As a matter of fact, the part of the Manual which you have read for administrators which has been marked for identification . . . were part of your duties, right?

A. Yes, sir.

Q. And that says "establishing policy", doesn't it?

A. Yes, sir.

The classification plan for Commonwealth employees described the work as "reviewing, analyzing and developing program policies and operating procedures. Initiative and independent judgment are exercised within a broad framework of existing laws and policies."

Plaintiff Rotondi also testified as follows:

Q. And you also received some direction from Mr. Cohen and his staff asking you to become more involved in policymaking and interchanging with the public?

A. Yes, sir.

Other examples described in the plan included devising solutions to administrative problems and developing and evaluating administrative policies and procedures. Both Rotondi and Farkas admitted they performed these duties.

Direct examination indicated that district administrators perform some non-discretionary, non-policymaking duties. However, to be classified as a policymaking, discretionary employee, an individual need not make policy or exercise discretion every minute of his working day.

Other testimony elicited at trial compels the conclusion that plaintiffs occupied policymaking positions. Consider the testimony of the remaining plaintiffs:

[Hammerle]:

Q. Would you . . . read for the Court how you described your duties and responsibilities [in your job application]?

A. I also determined cross training procedures and assignment policies for income tax and sales tax and oversee all realty transfer work . . . Generally, my position is a multifaceted administrative position . .

[Coco]:

Q. Would you . . . read for us what you considered the description of your duties and accomplishments, responsibilities in your job as district administrator?

A. "Managing overseeing and developing policies for the operation of the district office . . ."

Q. That was true, wasn't it?

A. Yes, it was.

Q. May I ask you to read to us the last three paragraphs on the page [of your application for employment]?

A. . . . Included in my responsibilities as district administrator are managing, overseeing and developing policies for the operation of the district office . . .

[Enea]:

Q. Now, in applying for this job, you, of course, had received a job description?

A. Yes.

Q. And the responsibilities for which you were applying?

A. That's right.

Q. And you also included the work that you had been doing which is what they asked you to describe, correct?

A. Yes, sir.

Q. Would you be good enough to read [your application for employment] for us . . . ?

A. ". . . my duties encompassed all of the responsibilities as set forth in the Department of Revenue job announcement for the position of district administrator . . .

Q. So you felt that your duties had been exactly as those described by the Secretary in the job description which he had sent to you in July?

A. That is correct.